**Darby Jon OPSAHL, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. A04–1992.**

Supreme Court of Minnesota.

March 9, 2006.

John Stewart, Public Defender, Lawrence Hammerling, Deputy State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Michael K. Junge, Amy Elizabeth Olson, McLeod County Attorney, Glencoe, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

Darby Jon Opsahl was convicted of first-degree murder for the shooting death of Margaret Rehmann in October 1986. On direct appeal, we affirmed. *State v. Opsahl (Opsahl I)*, 513 N.W.2d 249, 255 (Minn.1994). Opsahl's subsequent petition for postconviction relief was denied without evidentiary hearing by the postconviction court. On appeal, we affirmed in part, reversed in part, and remanded to the postconviction court with instructions to conduct an evidentiary hearing on Opsahl's claims that he was entitled to a new trial because of prosecutorial misconduct and witness recantations. *Opsahl v. State (Opsahl II)*, 677 N.W.2d 414, 425 (Minn.2004). Following the evidentiary hearing, the postconviction court rejected Opsahl's remaining claims and again denied his petition for relief. We affirm.

In October 1986, Margaret Rehmann was found murdered in her home in rural Lester Prairie, Minnesota. An extensive police investigation was initially unable to identify a suspect, but approximately a year after the murder Jeff Olson, a friend of Opsahl's, told police that Opsahl and a man named John Kanniainen had been involved in Rehmann's death. Police officers then arranged a meeting with Olson and Opsahl, during which Opsahl told officers that he and Kanniainen had often driven around the Lester Prairie area while drunk and high on drugs, looking for homes to burglarize. During one of their "booze cruises," Kanniainen had gone up to a house, had been greeted by a middle-aged woman, and had gone inside. About 10 minutes later, Opsahl heard a gunshot, and about 20 minutes after that, Kanniainen came out of the house with some half-dollar coins and said that he had shot a woman.

After hearing Opsahl's story, officers accompanied Olson and Opsahl on a car ride through rural McLeod County, during which Opsahl identified the Rehmann residence as a place that could have been where Kanniainen had shot the woman. Opsahl also said that another farm site looked familiar, and that he could not be sure which home it had been because he had been to so many homes on burglaries. Later, Opsahl provided police with another statement and accompanied an officer to a hardware store to identify the type of weapon that Kanniainen had allegedly used in the shooting. Opsahl pointed out a

.44 caliber handgun, the same type of gun that had been used in Rehmann's murder.

In 1988, the police informed Opsahl that Kanniainen had been out of state for the entire month in which the Rehmann murder had occurred, and therefore could not have been involved. Confronted with this information, Opsahl said, "if Kanniainen wasn't there, then I wasn't there."

In subsequent interviews, Opsahl gave police several different stories. In a 1989 interview, Opsahl said it could have been Olson or Tim Efteland who had been with him on the burglary instead of Kanniainen. In April 1990, Opsahl claimed that Kanniainen had not been involved in the murder, and that he and Olson had agreed to blame Kanniainen for the murder because Olson hated Kanniainen. In October 1990, Opsahl denied all involvement in the incident, but in April 1992 he again claimed that he had remained in the car while Kanniainen had shot Rehmann.

At Opsahl's trial in 1992, the state presented the testimony of several of Opsahl's acquaintances, all of whom recounted statements made by Opsahl and Olson in which the two had implicated themselves in the Rehmann murder. Opsahl testified in his own defense, but called no other witnesses. Though Opsahl admitted to "booze cruising" with Kanniainen around the time of the Rehmann murder, he denied that he had been involved in the Rehmann murder, that he had been at a burglary scene in McLeod County, or that he had ever told anyone that he had committed a murder. The jury convicted Opsahl of first-degree murder, and we affirmed on direct appeal, holding, inter alia, that the record contained sufficient evidence to support his conviction. *Opsahl I*, 513 N.W.2d at 255.

In October 2002, Opsahl filed a petition for postconviction relief in district court, and in support of his petition, Opsahl submitted affidavits that suggested that pros-

ecutors had committed misconduct by pressuring witnesses to testify falsely at Opsahl's trial, and also suggesting that, to various degrees, several of the state's witnesses had subsequently recanted their testimony from Opsahl's trial. One such witness, Richard Rogowski, asserted in his affidavit that his trial testimony had been a complete fabrication: he had not actually seen Opsahl at a Fourth of July party in 1988, and Opsahl had never said anything to him about being involved in a burglary and a shooting. Rogowski claimed that he "made up the entire story" he presented at trial because he had received threats from the prosecutor. A second trial witness, Ross Reinitz, signed an affidavit claiming that he told the prosecutor prior to Opsahl's trial that he had not clearly heard the conversation between Opsahl and Olson that he related in his testimony. Reinitz's affidavit also said that he had assumed that the conversation—in which Olson suggested that he and Opsahl could "take care" of a bothersome neighbor like they had taken care of "that old bitch by Lester Prairie"—had been a joke, but that he had not been able to explain this assumption at trial. The affidavit of Laura Roberts, another state trial witness, stated that prior to Opsahl's trial she had told the prosecutor that she was an "unreliable witness" and had "no clear recollection of any conversation with Mr. Opsahl in which he [had] admitted hurting an old lady," but that the prosecutor had nonetheless told her to testify "without qualification."

Opsahl also submitted affidavits from Maury Beaulier, an attorney who had represented Opsahl in 1998, and William O'Keefe, a private investigator who had been hired by Opsahl's counsel. Beaulier's affidavit claimed that another of the state's trial witnesses, Marina Allan, had completely recanted her testimony both in an interview with Beaulier and in a second interview with a hired investigator.

O'Keefe's affidavit claimed that state witness Dean Johnson had hinted in an interview that he had actually had several beers—not a single beer, as he had claimed at trial—when he had overheard Opsahl implicate himself in the Rehmann murder.

Based on the evidence in these affidavits, Opsahl claimed that he was entitled to a new trial or, alternatively, an evidentiary hearing. The postconviction court denied Opsahl's request for an evidentiary hearing and denied his petition. On appeal, we reversed the postconviction court's decision to deny an evidentiary hearing, determining that the affidavits presented by Opsahl had established a dispute of material fact with regard to Opsahl's witness-recantation and prosecutorial-misconduct claims, and that Opsahl was therefore entitled to an evidentiary hearing.[1] *Opsahl II,* 677 N.W.2d at 423–25. We remanded for an evidentiary hearing on these two claims and retained jurisdiction. *Id.* at 425.

After we remanded the case, some of the allegedly recanting witnesses were interviewed for the state by Detective Matt Rolf. In these interviews, witnesses often contradicted or undermined the statements attributed to them in Opsahl's postconviction affidavits. Rogowski, for one, told Rolf that he actually had seen Opsahl at a Fourth of July party in 1988, contrary to his affidavit. When Rolf confronted Rogowski with his affidavit, Rogowski said, "I don't know what the hell them words are." Rogowski asserted, as he had in his affidavit, that he had "made up the entire story" he had told at trial, but he also asserted that he had not lied at trial. He explained to Rolf, "the mind's not as good as it used to be * * * I abused myself in the chemicals." Roberts also significantly

undermined her affidavit, telling Rolf that her assertion in her affidavit that she did not remember the conversation that she had related at trial was a "crock of crap," and that she had testified at trial of her own free will and had "never said [she] was an unreliable witness." Roberts said that the conversation had essentially transpired as she had testified, but that with the benefit of hindsight, Opsahl's statement that he had hurt "the old lady" actually might have been a slang reference to his girlfriend. Allan denied that she had recanted her trial testimony to attorney Beaulier and his investigator, and told Rolf that they had asked her to say that she had lied. She also stood by her trial testimony. Finally, Allan Kroells told Rolf that he had not personally heard Opsahl or Olson make the statements that he had attributed to them at trial; he had only heard third parties attribute the statements to Opsahl and Olson.

After reviewing transcripts of Detective Rolf's interviews, Opsahl claimed that Rolf's actions constituted prosecutorial misconduct. Opsahl claimed that Rolf had improperly intimidated his interviewees by telling them, first, that making two contradictory statements under oath is necessarily perjury, and second, that they could be subject to perjury prosecutions for statements that they had made in the 1992 trial, though arguably the relevant statute of limitations precluded such a prosecution.

At Opsahl's evidentiary hearing in July 2004, several of the witnesses from Opsahl's 1992 trial testified, often contradicting earlier statements that they had made in their affidavits, to Detective Rolf, and at Opsahl's trial:

---

1. Opsahl also argued that he was entitled to a new trial or a *Schwartz* hearing based on juror misconduct, and he alleged that he was deprived of his Sixth Amendment right to effective assistance of counsel, but we rejected those claims, and they are no longer at issue. *See Opsahl II,* 677 N.W.2d at 421–22.

- Rogowski testified at the evidentiary hearing that he had been high on Oxy-Contin when he had talked to Rolf. He claimed—contrary to his interview with Rolf and his trial testimony, but consistent with his affidavit—that he had not attended a Fourth of July party with Opsahl. He claimed that Opsahl never told him about a burglary in which someone had been shot, and that he had made up the story he had told at Opsahl's trial. But Rogowski also admitted that he already had told his supposedly made-up story to deputies before he had talked to the prosecutor, and, consequently, he could not have made up the story as a result of prosecutorial pressure, as he had claimed in his affidavit. Rogowski claimed that he had only testified to the false story at trial because the prosecutor had threatened to revoke his parole if he did not, and that he had fabricated the conversation from information he had received from Tim Efteland.

- As in her interview with Detective Rolf, but contrary to her affidavit, Roberts testified in the evidentiary hearing that she had, in fact, remembered a conversation with Opsahl in which he had said that he had been involved in hurting an old lady. But Roberts reiterated that in hindsight she thought that "old lady" had probably meant Opsahl's girlfriend. Consistent with her affidavit and contrary to her statement to Rolf, she claimed she *had* told the prosecutor that she might be an unreliable witness.

- Kroells repeated his claim that he had heard about Opsahl's and Olson's involvement in the murder from third parties, but also said that he *had* over-

heard Opsahl and Olson say something about a robbery and shooting. He said that he did not lie at trial or before the grand jury, and that he was given no inducement to testify.

- Reinitz's testimony at the hearing was consistent with his affidavit. He claimed that he had heard Olson say that he and Opsahl "could always take care of [their neighbor] like [they] took care of that old bitch by Lester Prairie," but he had understood them to be joking at the time, which he did not explain at trial.

- Allan stood by her trial testimony and again denied that she had ever recanted to attorney Beaulier and his investigator.

- Johnson also stood by his trial testimony, contrary to the information in investigator O'Keefe's affidavit suggesting that Johnson had lied at trial about the number of beers he had consumed.

Based on the testimony at the evidentiary hearing and other evidence, the postconviction court again denied Opsahl's petition, determining both that the court was "not well satisfied" that witnesses had lied at trial, and that the state had not committed prosecutorial misconduct. Opsahl again appeals, presenting two claims. First, Opsahl claims that the postconviction court abused its discretion by denying his request for a new trial based on his witness-recantation claim. Second, Opsahl claims that Detective Rolf engaged in misconduct after our remand by improperly threatening witnesses with perjury prosecutions. In this appeal, Opsahl challenges only Rolf's post-remand actions, and has abandoned his earlier claim that the state's actions prior to his 1992 trial constituted prosecutorial misconduct.[2]

**2.** The state has moved to strike Opsahl's pro se supplemental brief. We deny the state's motion to strike.

## I.

First, we consider Opsahl's witness-recantation claim. While we review issues of law de novo, we will only overturn the denial of a witness-recantation claim if the postconviction court has abused its discretion. *Williams v. State,* 692 N.W.2d 893, 896 (Minn.2005). Our review of issues of fact is limited to a determination of whether the evidence is sufficient to support the postconviction court's findings. *Id.*

Traditionally, "[c]ourts have * * * looked with disfavor on motions for a new trial founded on alleged recantations unless there are extraordinary and unusual circumstances." *State v. Hill,* 312 Minn. 514, 523, 253 N.W.2d 378, 384 (1977). We evaluate recantations using the three-prong *Larrison* test, granting a new trial only if the petitioner can meet, by a fair preponderance of the evidence, the following three requirements:

> (1) the court must be reasonably well-satisfied that the testimony in question was false; (2) [petitioner must show that] without that testimony the jury might have reached a different conclusion; and (3) the petitioner [must show that he or she] was taken by surprise at trial or did not know of the falsity until after trial.

*Opsahl II,* 677 N.W.2d at 423.[3] While both of the first two *Larrison* prongs are compulsory, we have established that "the third prong is not a condition precedent for granting a new trial, but rather a factor a court should consider when deciding whether to grant the petitioner's request." *Opsahl II,* 677 N.W.2d at 423. In order to satisfy the first prong, a simple statement contradicting earlier testimony is not sufficient, nor is a determination that a witness is generally unreliable—the court must be

"reasonably certain that the recantation is *genuine."* *State v. Walker,* 358 N.W.2d 660, 661 (Minn.1984) (emphasis added).

Opsahl argues that the postconviction court abused its discretion in its application of the first and second prongs of the *Larrison* test. But because Opsahl has not sufficiently demonstrated that any witness recantations were genuine, Opsahl has not met his burden on the first prong. Some witnesses who appeared to have recanted based on affidavits have since reversed any recantation they may have made, and now stand by their trial testimony. Other witnesses claim merely that they did not give a full explanation of their testimony at trial, which does not satisfy the *Larrison* test's requirement that trial testimony be false. Still other witnesses have changed stories so many times that it would be difficult to ever be "well satisfied" that they lied at trial. As noted above, it is not sufficient for the purposes of the *Larrison* test to demonstrate that witnesses are generally unreliable; instead, the defendant must convince the court that the witnesses' recantations are genuine. *See Walker,* 358 N.W.2d at 661. Finally, our standard of review reminds us that the postconviction court is in a unique position to assess witness credibility, and we must therefore give the postconviction court considerable deference in this regard. *See Williams,* 692 N.W.2d at 896.

For these reasons, we hold that the postconviction court did not abuse its discretion when it determined that it was "not well satisfied" that any witnesses gave false testimony at trial, and that Opsahl therefore failed to satisfy the first prong of the *Larrison* test. Because the postconviction court did not abuse its discretion by determining that Opsahl had not satisfied the first prong of the *Larrison* test, Op-

---

**3.** These factors are derived from *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir. 1928), *overruled by United States v. Mitrione,* 357 F.3d 712, 719 (7th Cir.2004).

sahl's witness-recantation claim fails, and we need not consider whether he satisfied the other two prongs.

## II.

We now consider Opsahl's claim of prosecutorial misconduct by Detective Rolf. We will reverse the denial of a prosecutorial-misconduct claim only when "the misconduct, viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that defendant's right to a fair trial was denied." *State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn.1980).

Opsahl argues that Detective Rolf, acting on behalf of the prosecutors, improperly intimidated his interviewees by threatening them with perjury. Rolf told some witnesses (incorrectly) that making two contradictory statements under oath is necessarily perjury, and that they could be prosecuted for perjury for statements they made in Opsahl's 1992 trial, even though the statute of limitations precluded such a prosecution. While we agree that Detective Rolf's behavior was clearly inappropriate to some degree, the following factors substantially mitigate the harm of his actions: (1) no witnesses were so intimidated that they did not testify at the evidentiary hearing; (2) Rogowski and Roberts actually testified favorably for Opsahl, despite being interviewed by Rolf; (3) Johnson and Allan would not have been likely to testify favorably for Opsahl regardless of Rolf's actions since they had not signed affidavits; (4) the witnesses were properly warned by Rolf about the consequences of perjury regarding their affidavits and postconviction-hearing testimony even if Rolf misstated the extent to which they

were subject to perjury prosecutions for earlier statements; (5) Rolf was questioned at the hearing about his behavior; (6) no witnesses testified that they were intimidated by Rolf; and (7) Roberts, Rogowski, Kroells, Allan, and Johnson all affirmatively testified that Rolf did not intimidate them. For these reasons we hold that Rolf's behavior, though improper, was not "so serious and prejudicial that defendant's right to a fair [hearing] was denied." *Wahlberg*, 296 N.W.2d at 420.[4]

Affirmed.

ANDERSON, G. BARRY, J., took no part in the consideration or decision of this case.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

4. We also reject Opsahl's argument that he should receive a new trial because his case did not " 'satisfy the appearance of justice.' " *See Shorter v. State*, 511 N.W.2d 743, 747 (Minn.1994) (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954)) (holding that though no single error warranted relief for a defendant, in aggregate, the errors warranted relief in order to satisfy the appearance of justice).