**Brian Keith PIPPITT, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. A06–2106.**

Supreme Court of Minnesota.

Aug. 16, 2007.

Robert A. O'Malley, Minneapolis, MN, for Appellant.

Lori Swanson, Attorney General, St. Paul, MN, John J. Sausen, Assistant County Attorney, Brainerd, MN, for Respondents.

## OPINION

GILDEA, Justice.

This case comes to us on appeal from the postconviction court's denial of petitioner Brian Keith Pippitt's petition for postconviction relief. Pippitt was convicted of the first-degree premeditated murder of Evelyn Malin and first-degree murder while committing burglary. For these crimes, Pippitt received two concurrent life sentences. On direct appeal we vacated the conviction for first-degree murder while committing burglary and affirmed the conviction for first-degree premeditated murder. *State v. Pippitt*, 645 N.W.2d 87, 96 (Minn.2002). We held, among other

things, that the evidence was sufficient to convict Pippitt of first-degree premeditated murder. *Id.* at 94.

Approximately three years after we decided his direct appeal, Pippitt petitioned for postconviction relief. After an evidentiary hearing, the postconviction court denied the petition. Pippitt now appeals to this court claiming that the postconviction court erred when it found that he was not entitled to a new trial based on new evidence, prosecutorial misconduct and ineffective assistance of trial counsel.[1] We affirm.

The facts underlying the crime and the evidence against Pippitt are set forth in our opinion in Pippitt's direct appeal. *See Pippitt*, 645 N.W.2d at 89–92. We discuss in this opinion only those facts and evidence relevant to the issues Pippitt raises in this appeal.

Pippitt's new evidence claim involves the trial testimony of Raymond Misquadace (Raymond), Peter Arnoldi and Merle Malin. We begin with a discussion of this testimony and the evidence received at the postconviction hearing related to this testimony.

Much of the evidence of Pippitt's involvement in the crime came from the testimony of Raymond, who was an accomplice. Raymond testified that he, Pippitt and three other men stopped at the Dollar Lake Store on February 24, 1998, at 9 or 10 p.m. The victim, Evelyn Malin, owned and operated the Dollar Lake Store, which was attached to her home. According to Raymond, the store was already closed when they arrived, but Pippitt and two of the other men decided to enter the store to get beer. Pippitt walked to the store's front door while the other two men walked around the store. Raymond heard a thump or a crash and then noticed that the front door was open, Pippitt was no longer standing at the front door and shadows were moving inside the store. A short while later, Raymond saw the three men return to the car where he was waiting, but he did not see from which direction they came. The men were carrying cigarettes and beer and one stated that he had choked Malin while Pippitt hit her.

Pippitt argued to the postconviction court that Raymond had recanted. But Pippitt did not present testimony from Raymond to the postconviction court. Instead, Pippitt supported this argument through statements from Jeri Severson. Severson, who had been the crime victims' advocate for the Aitkin County Sheriff's Department at the time of Pippitt's arrest and trial, testified and swore by affidavit that in April 2005, Raymond told her that he had been pushed into a false confession by law enforcement and that "he told them what he thought they wanted to hear because he thought it would be better for him, but instead it ruined his life." Severson later attempted to contact Raymond before the hearing, but was not able to do so.

Also relevant to this appeal is the testimony from Peter Arnoldi, who corroborated Raymond's testimony at trial. Arnoldi had been in custody with Pippitt and he testified that Pippitt confessed to the murder. As we noted on direct appeal, "Arnoldi's credibility was seriously called into question" during trial. *Pippitt*, 645 N.W.2d at 94. In the postconviction proceeding, Pippitt challenged Arnoldi's testimony through an affidavit from Craig Licari. In his affidavit, Licari claimed that he had met Pippitt and Arnoldi at the state

---

1. Pippitt raises a number of additional claims in his pro se brief. We have reviewed these claims and conclude that they have no merit.

hospital in St. Peter and that Arnoldi had told him that Pippitt was charged with murder but that he was innocent and that Pippitt's relatives had implicated him in the hope of receiving reward money. Licari also stated, "Mr. Arnoldi had told me consistently in May of 1999 that his conversations with Mr. Pippitt, along with his reading of Mr. Pippitt's case materials, had led him to a firm belief that Mr. Pippitt was innocent. And he never told me that Mr. Pippitt had also confessed to the crime."

Pippitt's new evidence claim also involves the testimony of Merle Malin, the victim's son. As indicated above, Raymond suggested that Pippitt went into the Dollar Lake Store through the front door, while the other two men went around to the back.[2] At trial, Malin testified that because the front door sagged, his mother was not physically capable of lifting it sufficiently to engage the dead bolt.[3] Malin's testimony thus suggested that the front door was not dead bolted and could have been used to enter the store. The state offered this testimony to corroborate Raymond's testimony regarding Pippitt's point of entry.[4]

At the postconviction hearing, which was held eight years after the murder and five years after the trial, Merle Malin testified

that his mother always locked the front door and that he did not recall whether the door had a dead bolt. After seeing a picture of the front door, Merle Malin testified that the door did have a dead bolt, and that his mother could lock it. Malin said that he did not recall his trial testimony regarding the dead bolt issue, and stated that because he had not been to the store for four or five months before the murder, he did not know if the dead bolt worked at the time of the murder.

In addition to his new evidence claim involving the testimony of Raymond, Arnoldi, and Malin, Pippitt also raises an issue in this appeal relating to the statements made and testimony provided by Michael Misquadace (Michael), an alibi witness the defense offered at trial. Michael testified that he and Pippitt were at the casino in Mille Lacs until sometime in the evening, then went to the home of Michael's fiancée before returning to Pippitt's mother's home where they stayed for the remainder of the evening. Michael's fiancée also testified that Pippitt had accompanied Michael to her home the evening of the 24th. Her sister and her sister's fiancé testified that Pippitt had stopped by the home with Michael some evening in late February.

2. The state's theory was that the men gained entry through a basement window.

3. Malin testified that he saw his mother lock up "several times" and that she did not utilize the deadbolt on the front door because "she couldn't." Malin recounted to the jury a specific instance from the fall before the February 1998 murder when he was with his mother at the store. He dead bolted the front door at closing time. But the next morning he was not with his mother when she opened the store. He testified that he "really caught it" from his mother because he dead bolted the door and she was not able to get the door open in the morning.

4. The evidence presented at trial regarding whether the front door was in fact dead bolted at the time of the murder, however, is inconclusive. The chief investigator admitted that he did not know whether the door was dead bolted when police arrived on the scene. He did not examine the door and lock until after it had been removed from the store and no evidence was presented that indicated that any one conducted such an examination. Moreover, as we noted on direct appeal, "Arnoldi testified that Pippitt told him they entered through a window." *Pippitt*, 645 N.W.2d at 93. Physical evidence at the scene "was also consistent" with a window entry. *Id.*

The police interviewed Pippitt twice before his arrest and once after he was in custody, but Pippitt did not tell the police during these interviews that he was with Michael on the night of the murder. At trial, the only explanation that Pippitt gave for failing to inform the police of his alibi was, "I'm not going to give any testimony to a law enforcement officer that I don't know at the time is true." At the postconviction hearing, Pippitt explained that he was not aware that February 24, 1998, was the day that he had gone to the casino with Michael until his mother visited him in jail and reminded him. He stated that he was first questioned about the murder 11 or 12 months after it had happened and that he had no reason to recollect what he was doing that long ago.

■ As indicated above, Pippitt contends the postconviction court erred when it denied his petition. On review of a postconviction decision, we determine whether there is sufficient evidence to support the postconviction court's findings. *White v. State*, 711 N.W.2d 106, 109 (Minn. 2006). The postconviction court's decision will not be overturned unless the court has abused its discretion. *Id.* A postconviction court's legal determinations are reviewed de novo, but its factual findings will not be set aside unless they are clearly erroneous. *Schleicher v. State*, 718 N.W.2d 440, 445 (Minn.2006); *Doppler v. State*, 660 N.W.2d 797, 801 (Minn.2003). Finally, Pippitt has the burden of showing that he is entitled to relief. *See Wilson v. State*, 726 N.W.2d 103, 106 (Minn.2007).

## I.

We first address whether the postconviction court erred when it concluded that Pippitt was not entitled to a new trial based on newly discovered evidence. Pippitt argues that witness recantations provide the new evidence that entitles him to a new trial. Specifically, he argues that Severson's testimony leads to the conclusion that Raymond's testimony was false, that Licari's affidavit shows that Arnoldi's testimony was false, and that Malin's testimony at the postconviction hearing constitutes a recantation of his trial testimony. The postconviction court concluded that Pippitt's new evidence was "doubtful, impeaching or cumulative," and therefore did not entitle him to a new trial.

■ When considering whether a defendant is entitled to a new trial based on newly discovered evidence, we consider four factors. *See Race v. State*, 417 N.W.2d 264, 266 (Minn.1987). The defendant must show that (1) the evidence was not known to him or his counsel at the time of trial; (2) the failure to learn of the new evidence was not because of a lack of diligence; (3) "the evidence is material (or as we have sometimes said, is not impeaching, cumulative or doubtful)"; and (4) the evidence will probably produce an acquittal at a retrial or a more favorable result for the defendant. *Id.; see also Rainer v. State*, 566 N.W.2d 692, 695 (Minn.1997).

■ But when the newly discovered evidence is in the nature of a recantation by a witness who testified at trial, we use the three-prong *Larrison*[5] test. Wilson, 726 N.W.2d at 106 (citing *Larrison* test and distinguishing it from the four-prong newly discovered evidence test). Under the *Larrison* test, we will grant a new trial only if the petitioner meets, by a fair preponderance of the evidence, the following three requirements:

(1) the court must be reasonably well-satisfied that the testimony in question

---

5. *See Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928), *overruled by United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir.2004) (adopting a different test).

was false; (2) [the petitioner must show that] without that testimony the jury might have reached a different conclusion; and (3) the petitioner [must show that he or she] was taken by surprise at trial or did not know of the falsity until after trial.

*Opsahl v. State (Opsahl I)*, 677 N.W.2d 414, 423 (Minn.2004). The first two prongs of the *Larrison* test are compulsory, but the third prong is not. *See id.*

We turn now to an analysis of whether the new evidence Pippitt cites (the testimony from Severson, the affidavit from Licari, and the testimony from Malin) entitles him to a new trial.

### Severson's Postconviction Testimony

We first consider whether Severson's testimony constitutes a recantation of Raymond's testimony. The postconviction court ruled that Severson's testimony was hearsay and therefore inadmissible. We do not reach the merits of the court's evidentiary ruling because we conclude that even if the postconviction court had considered Severson's testimony, her account of Raymond's purported recantation does not meet the first prong of the *Larrison* test.

We generally look "with disfavor on motions for a new trial founded on alleged recantations * * *." *State v. Hill*, 312 Minn. 514, 523, 253 N.W.2d 378, 384 (1977). Thus, the first prong of the *Larrison* test is not met by "a simple statement contradicting earlier testimony." *Opsahl v. State (Opsahl II)*, 710 N.W.2d 776, 782 (Minn. 2006). It is likewise not sufficient under *Larrison* to determine that "a witness is generally unreliable." *Id.* Instead, we have said that "the court must be 'reasonably certain that the recantation is *genuine*'" before the first prong is met. *Id.*

(quoting *State v. Walker*, 358 N.W.2d 660, 661 (Minn.1984)).

■ The statements Severson attributed to Raymond do not constitute a genuine recantation. Raymond vaguely claimed that he was pushed into testifying falsely, without explaining which parts of his testimony were false or precisely how he was so coerced. Importantly, Raymond did not tell Severson that he did not commit the crime or that Pippitt did not commit the crime. Severson's second-hand account of Raymond's statements may cast doubt on Raymond's reliability, but it does not satisfy the rigorous genuine recantation standard. Accordingly, we hold that the postconviction court did not abuse its discretion in finding that Pippitt was not entitled to a new trial based on Severson's testimony.

### Licari's Postconviction Affidavit

■ Pippitt next argues that he is entitled to a new trial because of Licari's statements. While the *Larrison* test is applied to witnesses who recant trial testimony, we have also indicated that *Larrison* applies more generally, such as "when a court reviews an allegation that false testimony was given at trial." *Dukes v. State*, 621 N.W.2d 246, 257 (Minn.2001). Licari's affidavit, however, does not lend itself to analysis under *Larrison*. The second prong of *Larrison* requires consideration of whether the jury may have reached a different conclusion without the recanted testimony. *See State v. Turnage*, 729 N.W.2d 593, 598 (Minn.2007) (discussing second prong). Unlike a witness recantation, Licari's affidavit does not nullify Arnoldi's trial testimony; it simply provides some evidence that, if admissible, could be used to impeach Arnoldi's trial testimony.[6] An analysis that considers the

---

6. The postconviction court refused to issue a      writ of habeas corpus ad testificandum to

jury verdict in the absence of Arnoldi's testimony is therefore inappropriate.

Consequently, we apply the *Race* four-prong test to Licari's affidavit. We assume that the evidence presented in Licari's affidavit meets the first two prongs of the *Race* test. But the third prong requires that the evidence be material, and not merely impeaching. *Race*, 417 N.W.2d at 266. We will not grant a new trial on the basis of evidence that is merely impeaching. *See, e.g., Dale v. State*, 535 N.W.2d 619, 622 (Minn.1995). Because Licari has no direct knowledge of anything relating to Malin's murder or Pippitt's involvement in it, the testimony in Licari's affidavit would not be admissible for any purpose other than Arnoldi's impeachment. Licari's statement provides an additional basis to challenge the credibility of Arnoldi's trial testimony.[7] But being merely impeaching, Licari's statement does not meet the third prong of *Race*. *See Dale*, 535 N.W.2d at 622 (concluding that new evidence that "does no more than impeach" the complainant did not entitle defendant to a new trial). Accordingly, we hold that the postconviction court did not abuse its discretion in concluding that Licari's affidavit did not entitle Pippitt to a new trial.

### Merle Malin's Postconviction Testimony

Pippitt's final piece of new evidence involves the testimony of Merle Malin, the victim's son. Pippitt does not argue that Malin's testimony at the postconviction hearing is new evidence under *Race*. He argues only that Malin's postconviction testimony constitutes a recantation of Malin's trial testimony regarding the victim's ability to dead bolt the front door. We disagree.

Malin did not state at the postconviction hearing that his trial testimony was false. Indeed he gave no testimony at the hearing about the merits of his statements at trial that his mother was not physically capable of lifting the door into place so the dead bolt could engage. Rather, he initially stated at the hearing that he could not remember whether the door even had a dead bolt. When shown a picture of the door, he reported his memory being refreshed, and confirmed that the door had a dead bolt and that his mother could lock it. While that portion of Malin's postconviction testimony conflicts with his trial testimony, the conflict does not necessarily indicate that his trial testimony was false for purposes of the *Larrison* test. *See Opsahl II*, 710 N.W.2d at 782 (noting that "a simple statement contradicting earlier testimony" does not satisfy the first prong of *Larrison* ).

Malin's trial testimony was closer in time to, and provided much more detail regarding, the facts about which Malin testified. When we compare the level of detail Malin provided about the front door during his trial testimony with his inability to remember, at the postconviction hear-

---

compel the commissioner of corrections to bring Licari to court to testify. We emphasize what we have said before about the necessity of an evidentiary hearing for the postconviction court to make credibility determinations. *See, e.g., Turnage*, 729 N.W.2d at 598. For the purpose of this analysis, we therefore assume that had Licari testified, his testimony would have been credible and would have been consistent with the substance of his affidavit. We also assume, but do not decide, that Licari's testimony would be admissible to

impeach Arnoldi's credibility. *See* Minn. R. Evid. 613(b) (discussing admissibility of extrinsic evidence of prior inconsistent statements).

7. Licari's testimony also has limited impeachment value because of its vagueness. Licari does not state precisely when he had his conversations with Arnoldi, so it cannot be determined whether they occurred before or after Arnoldi claims Pippitt confessed to him.

ing, whether the door even had a dead bolt, we cannot be reasonably "well-satisfied" that his trial testimony was false, as required by the *Larrison* test. *Id.* We therefore hold that the postconviction court did not abuse its discretion in finding that Pippitt was not entitled to a new trial based on Malin's testimony.[8]

Because Pippitt has not met his burden of establishing, by a fair preponderance of the evidence, facts that would warrant a reopening of the case, we hold that the postconviction court did not err in denying relief based on newly discovered evidence.

## II.

■ We next consider Pippitt's claim that the prosecutor committed misconduct by arguing in closing that Pippitt did not have an alibi prior to May 1999 and that his alibi at trial was fabricated. Specifically, Pippitt claims that Michael's statement to the police, which was given before May 1999, shows that Pippitt had an alibi and therefore the prosecutor engaged in improper argument by suggesting otherwise. The postconviction court concluded that Pippitt's prosecutorial misconduct claim was *Knaffla*-barred because he failed to raise it on direct appeal. We agree.

■ We have consistently recognized that when a direct appeal has been taken, all matters raised and all matters that could have been raised in the appeal "will not be considered upon a subsequent petition for postconviction relief." *State v. Knaffla*, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976). When Pippitt appealed

his conviction to this court, he knew what the state had asserted in its closing argument. We therefore hold that the postconviction court did not abuse its discretion in finding that Pippitt's prosecutorial misconduct claim was *Knaffla*-barred.[9]

## III.

Finally, Pippitt argues that he was denied effective assistance at trial because his counsel failed to call his mother and a former cell mate as witnesses, and failed to object to the prosecutor's claim in closing argument that Pippitt had no alibi prior to May 1999. We have said that "an ineffective assistance of trial counsel claim is generally *Knaffla*-barred in a postconviction petition if the claim can be decided on the basis of the trial record and the briefs." *White*, 711 N.W.2d at 110. But, under the second exception to the *Knaffla* rule, an ineffective assistance of counsel claim, even if "known but not raised at the time of direct appeal, may be brought in a postconviction petition if the claim cannot be 'evaluated by an appellate court on direct appeal based on the briefs and trial court transcript, without any additional factfinding.' " *Carney v. State*, 692 N.W.2d 888, 891 (Minn.2005) (quoting *Robinson v. State*, 567 N.W.2d 491, 495 (Minn.1997)).

■ In order to prevail on a claim of ineffective assistance of counsel, Pippitt must show "that his counsel's representation 'fell below an objective standard of reasonableness' and 'that there is a reasonable probability that, but for counsel's * * * error[ ], the result of the [trial]

---

8. Even if Pippitt had argued that this evidence was new evidence under *Race,* this claim would fail because Malin's postconviction testimony was doubtful about his mother's use of the dead bolt. Accordingly, this testimony would not satisfy the third prong of the new evidence test set forth in *Race,* 417 N.W.2d at 266.

9. "There are two exceptions to the *Knaffla* rule: (1) if a novel legal issue is presented, or (2) if the interests of justice require review." *White,* 711 N.W.2d at 109. Pippitt's prosecutorial misconduct claim is not novel and, as more fully explained in section III, the interests of justice do not require review.

would have been different.'" *Gates v. State*, 398 N.W.2d 558, 561 (Minn.1987) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). We have said that decisions about which witnesses to call and what objections to make are trial strategy decisions within the proper discretion of trial counsel. *State v. Vick*, 632 N.W.2d 676, 689 (Minn.2001); *State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986). Accordingly, our review of trial counsel's performance does not include reviewing attacks on trial strategy. *Opsahl I*, 677 N.W.2d at 421.

Pippitt has not shown that his counsel's decisions regarding witness selection were objectively unreasonable. The evidence that Pippitt's mother could have provided, had she testified at trial, included evidence of an alibi, which was already presented by at least four other witnesses, and evidence which conflicted with certain details that Raymond first testified to, but then admitted not remembering exactly. Pippitt also claims that his former cell mate could have provided evidence of efforts to coerce other inmates to testify against Pippitt. At the postconviction hearing, Pippitt's trial attorney testified that he attempted to get more information about the allegation, but was unable to substantiate anything beyond innuendo. Based on the above, we conclude that the decision of Pippitt's trial counsel not to call Pippitt's mother and former cell mate did not fall below an objective standard of reasonableness.

Pippitt also argues that his trial counsel was ineffective for failing to object to the prosecutor's statements regarding Pippitt's lack of an alibi. Pippitt relies on the statement that Michael gave to police the week after the murder to support this claim. It is unclear, however, whether Michael's statement was ever made part of the record. Despite references to Michael's statement in both the postconviction petition as well as the transcript of the postconviction proceeding, Michael's statement is not contained in the district court file. If Michael's statement was not a part of the record, then Pippitt's claim that his counsel was ineffective for failing to object to the prosecutor's assertion that he lacked an alibi prior to May 1999 is without merit. Without Michael's statement, there is nothing in the record indicating that Pippitt had any sort of alibi prior to May 1999. Without something in the record that calls into question the truthfulness of the prosecutor's statements, we have no basis for concluding that the prosecutor's statements constituted misconduct.

And even if Michael's statement was in fact part of the record, Pippitt's claim fails on the merits.[10] In the statement taken the week after the murder, Michael told police that on the day of the murder, he and Pippitt had gone to the casino in Mille Lacs, had stopped at a liquor store, and had returned home around 7:30 or 8 p.m. Michael's statement did not account for Pippitt's whereabouts for any time after 8 p.m. on the day of the murder. The statement therefore does not constitute an alibi for the time period of Malin's murder, which indisputably occurred sometime after 9 p.m. In addition, Michael's statement to the police differed from his trial testimony in which he claimed that he and Pippitt had stopped at Michael's fiancée's home after the casino and then had returned to Pippitt's mother's home where they remained the rest of

---

**10.** The Aitkin County Court Administrator provided us with a copy of the statement which she believed was a part of the record, but she obtained the statement directly from Pippitt's counsel, not from the district court records.

the evening. If Pippitt's trial counsel had objected to the prosecutor's attacks on Pippitt's alibi based on Michael's statement to the police, he would simply have drawn attention to the fact that the statement was inconsistent with Michael's trial testimony. This could only have hurt Pippitt because Michael was Pippitt's main alibi witness at trial. Counsel's failure to object under these circumstances therefore did not fall below an objective standard of reasonableness.

We hold that Pippitt has not met his burden of showing that he is entitled to postconviction relief based on ineffective assistance of counsel.

We affirm.