STATE OF MINNESOTA

IN SUPREME COURT

A12-2301

Hennepin County
                    Stras, J.
         Dissenting, Dietzen, J., Gildea, C.J.

Lincoln Lamar Caldwell,

        Appellant,

vs.
                   Filed:  September 24, 2014
                   Office of Appellate Courts

State of Minnesota,

        Respondent.

_____

Gregory J. Young, Minneapolis, Minnesota, for appellant.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

_____

S Y L L A B U S

The postconviction court abused its discretion when it denied the appellant's request for an evidentiary hearing on his witness-recantation claim.

Reversed and remanded.

Considered and decided by the court without oral argument.

1

OPINION

STRAS, Justice.

The appellant, Lincoln Lamar Caldwell, challenged his conviction of first-degree premeditated murder for the benefit of a gang in his third petition for postconviction relief, in which he alleged that three witnesses presented false testimony at his trial. The postconviction court summarily denied the petition. On appeal, Caldwell argues that the court abused its discretion when it failed to grant him an evidentiary hearing in connection with his petition. Because we conclude that Caldwell has alleged facts that, if proven, would entitle him to relief, we reverse and remand to the postconviction court for an evidentiary hearing.

I.

Kirk Harrison ("Kirk") shot and killed Brian Cole from an SUV driven by Caldwell. Both Caldwell and Kirk were members of the LL gang, which was engaged in an ongoing rivalry with the One-Nine gang. Cole was not a member of a gang, but he was standing near members of the One-Nine gang when Kirk shot him.

On the day of the murder, Caldwell drove an SUV with five passengers, including Kirk. According to the trial testimony of Kirk's brother, Carnell Harrison ("Carnell"), who was also a passenger in the SUV that day, Caldwell handed a gun to Kirk. Later, while Caldwell was driving the SUV in north Minneapolis, the group recognized members of the One-Nine gang in a crowd of 10 to 20 people. Caldwell drove around the block, parked the SUV, and then either Caldwell or Kirk said, "we can catch them over there." Each member of the group, except Carnell, walked toward the crowd. Carnell

2

assumed that Caldwell and Kirk were going to "shoot at [the One-Nines]." A few minutes later, the group of men returned to the SUV, at which point Caldwell and Kirk were arguing. Kirk said, "[y]ou should have took the shot," and Caldwell responded, "it was too crowded."

Caldwell then drove the SUV around the block again. Another passenger, William Brooks, testified that Caldwell and Kirk had remarked that members of the One-Nine gang had shot at them previously and that they "were going to get them." According to Brooks, Caldwell then passed a gun to Kirk. Other witnesses testified that, at some point, a passenger in the SUV pointed out the One-Nines, who were standing in a group of people. Caldwell then drove toward the group. When the SUV was near the One-Nines, Kirk leaned out of the window and attempted to fire the gun. Initially, the gun did not fire because of the safety mechanism. Once Kirk disengaged the safety, he fired six or seven shots into the crowd, one of which hit Cole and killed him. Caldwell and his passengers fled the scene in the SUV.

An acquaintance of Caldwell, S.T., testified at trial that he encountered Caldwell at a friend's house shortly after the shooting. According to S.T., Caldwell recounted "g[etting] down"—which S.T. understood as "fighting or shooting or [a] brawl or something"—with the One-Nines. Caldwell also explained that the "intended target" had been "Ill Will," one of the leaders of the One-Nine gang. From Caldwell's description of the gun—a "grey and black Smith & Wesson" 9mm semiautomatic pistol—S.T. recognized it as one that he had seen in Caldwell's possession on several occasions.

3

Before Cole's funeral, Caldwell encountered one of Cole's friends, who wore a t-shirt printed with an image of the newspaper article reporting Cole's death. Caldwell told the friend, "I'm the reason why you got that shirt." Later, Caldwell told an associate that he originally thought that the victim of the shooting was a member of the One-Nine gang with whom Caldwell had a particularly strong rivalry. Referring to killing Cole, Caldwell stated, "we shouldn't have did it. . . . Dude was a nobody."

A grand jury indicted Caldwell on six counts of murder as both a principal and an accomplice. *See* Minn. Stat. § 609.05, subd. 1 (2012). A jury found Caldwell guilty of all six counts. The district court convicted him of the most serious offense—first-degree premeditated murder for the benefit of a gang, Minn. Stat. §§ 609.185(a)(1), 609.229 (2012)—and sentenced him to life in prison without the possibility of release. Caldwell filed a direct appeal, which we stayed while he filed two petitions for postconviction relief. The postconviction court denied both petitions, after which we consolidated Caldwell's three appeals. In the consolidated appeal, we affirmed Caldwell's conviction and the denial of both petitions for postconviction relief. *State v. Caldwell*, 803 N.W.2d 373, 377 (Minn. 2011).

Caldwell subsequently filed a third petition for postconviction relief. In that petition, Caldwell alleged that Brooks, Carnell, and S.T. each testified falsely at his trial. He supported the petition with a statement by each witness and a signed and notarized affidavit in which the investigator who interviewed the witnesses affirmed that each statement was a true and correct transcription of his recorded interview with the witness. Caldwell also offered an undated handwritten note signed "William Brook."

4

In his transcribed statement, Brooks denied the following key facts from his trial testimony: that he heard Caldwell or Kirk say that the One-Nines had shot at them previously; that he heard Caldwell or Kirk say that they "were going to get" the One-Nines in retaliation for the previous incident; and that he saw Caldwell pass a gun to Kirk. As for the reason that Brooks's trial testimony differed from his statement, Brooks explained that he feared criminal liability for his involvement in the shooting. He was also upset with the others because "[a]ll these babies and kids and dogs and all types of people" had been present during the shooting. According to Brooks, he recanted because he felt bad that Caldwell "g[ot] life for something he didn't really do." The handwritten note stated that Brooks lied at trial in an attempt to make a deal with the prosecutor and get out of jail, but in his transcribed statement, Brooks specifically denied the facts from the handwritten note.

In his statement, Carnell denied several key facts from his trial testimony: that he saw Caldwell pass a gun to Kirk; that he heard members of the group discuss trying to "catch" the One-Nines on foot; and that he remembered many of the details from the shooting. Like Brooks, Carnell explained that his account differed at trial because he felt pressure to avoid criminal charges and that he came forward to prevent Caldwell from remaining in prison for a crime that he did not commit.

S.T. declared in his statement that he invented his trial testimony. More specifically, S.T. denied speaking to Caldwell at a friend's house shortly after the murder. In fact, S.T. stated that he did not see Caldwell at all in the aftermath of the shooting. S.T. also specifically denied seeing Caldwell with the gun Kirk used to shoot Cole, which

5

contradicted S.T.'s testimony at trial that the gun belonged to Caldwell. S.T. explained that he testified falsely in exchange for a suspended sentence on an unrelated charge. He came forward because, in his view, the police took advantage of him.

The postconviction court was not reasonably well satisfied that Brooks's and Carnell's trial testimony was false, nor was it reasonably well satisfied that S.T.'s testimony, even if it was false, might have affected the verdict. Accordingly, the court denied Caldwell's petition without an evidentiary hearing.

## II.

The question presented by this case is whether the postconviction court erred when it denied Caldwell's request for an evidentiary hearing. We review the ultimate decision by the postconviction court to grant or deny an evidentiary hearing for an abuse of discretion. *See Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012). In doing so, we review the postconviction court's underlying factual findings for clear error and its legal conclusions de novo. *Martin v. State*, 825 N.W.2d 734, 740 (Minn. 2013).

A postconviction petitioner is entitled to an evidentiary hearing "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1 (2012). In the context of witness-recantation claims, we have interpreted the statutory rule to impose two requirements. First, the allegations in a petition must be "more than argumentative assertions without factual support." *Beltowski v. State*, 289 Minn. 215, 217, 183 N.W.2d 563, 564 (1971). Stated differently, the allegations in the petition must have factual support that carries "sufficient indicia of trustworthiness," *Ferguson v. State* (*Ferguson II*), 779 N.W.2d 555,

6

560 (Minn. 2010), to "justify the expense and risk" of an evidentiary hearing. *State v. Ferguson* (*Ferguson I*), 742 N.W.2d 651, 660 (Minn. 2007); *see also Miles v. State*, 800 N.W.2d 778, 784 (Minn. 2011) (applying the indicia-of-trustworthiness standard from witness-recantation claims to claims involving newly discovered evidence). Second, the sufficiently trustworthy allegations must recite facts that would, if proven by a preponderance of the evidence, entitle the petitioner to a new trial. *See, e.g.*, *Martin*, 825 N.W.2d at 740; *see also* Minn. Stat. § 590.04, subd. 3 (2012) (setting the burden and standard of proof at evidentiary hearings). We address each of these requirements in turn.[1]

### A.

We begin with the first requirement, which is that Caldwell's evidence must bear "sufficient indicia of trustworthiness" to justify an evidentiary hearing. In this case, Caldwell has submitted statements from Brooks, Carnell, and S.T. that recant portions of their trial testimony. A signed and notarized affidavit from the investigator who interviewed each witness accompanies the statements and affirms that the interviews occurred and that the transcriptions are true and correct.

---

[1] While a postconviction petitioner must satisfy both requirements to be entitled to an evidentiary hearing, we do not mean to suggest that a court must address both requirements in order to *deny* an evidentiary hearing. For example, a postconviction court may deny an evidentiary hearing if the petitioner's allegations are legally insufficient without first addressing whether the petitioner's allegations bear sufficient indicia of trustworthiness. Conversely, a postconviction court may deny an evidentiary hearing if the petitioner's allegations do not bear sufficient indicia of trustworthiness without also addressing whether the petitioner's allegations are legally sufficient.

Often, a postconviction petitioner will submit an affidavit from a recanting witness in support of a petition, *see, e.g.*, *Ferguson II*, 779 N.W.2d at 558, but we have recognized that other forms of evidence, including a sworn affidavit from a third party, can provide sufficient indicia of trustworthiness to justify an evidentiary hearing. In *Dobbins v. State*, for example, we held that a petitioner was entitled to an evidentiary hearing based on an affidavit from a third party who allegedly had heard the prosecution's key witness confess to the crime of which the petitioner had been convicted. 788 N.W.2d 719, 732-34 (Minn. 2010). The factual support for the petition in *Dobbins* was sufficiently trustworthy because the petitioner "submitted a sworn affidavit from" the third party. *Id.* at 734; *see also Ferguson v. State*, 645 N.W.2d 437, 446 (Minn. 2002); *cf. Bobo v. State*, 820 N.W.2d 511, 514-15, 520 (Minn. 2012) (remanding for a postconviction evidentiary hearing based on newly discovered evidence in the form of third-party affidavits stating that an alleged alternative perpetrator had confessed to committing the crime). Similarly, in *Opsahl v. State*, we remanded for an evidentiary hearing based, in part, on "affidavits of individuals who claim[ed] to have heard certain state witnesses recant trial testimony." *Opsahl v. State* (*Opsahl I*), 677 N.W.2d 414, 419, 424 (Minn. 2004). We treated the third-party affidavits identically to first-party affidavits in which witnesses had recanted their own testimony. *Id.* at 419, 423-424.

There is no logical or legal reason to treat Caldwell's evidence any differently than the sworn affidavit of a third party who has heard a recantation. Similar to the affidavits in *Dobbins* and *Opsahl I*, the sworn affidavit of the third party in this case—an investigator who interviewed all three witnesses—affirms, under the penalty of perjury,

8

that the investigator heard each of the witnesses recant their trial testimony. To be sure, each of the recantations occurred in a more formal—and thus potentially more intimidating—setting here than in *Dobbins*, but we have never suggested that the trustworthiness of a recantation depends on the formality of the setting in which it occurs. Nor are third-party affidavits that summarize a witness's statement, such as those in *Dobbins* or *Opsahl I*, any more trustworthy than a contemporaneous recording and transcription that perfectly reproduces the recanting witness's *actual* statement. On the contrary, the type of evidence that Caldwell submitted with his petition in this case is likely to be *more* trustworthy than the third-party affidavits in *Dobbins* and *Opsahl I*, cases in which it was necessary to assume that an intermediary accurately reported the words of another person.

The handwritten note, by contrast, lacks sufficient indicia of trustworthiness. It is unsworn and undated, does not state which parts of Brooks's trial testimony were false, and twice misspells his name. Although it offers an explanation for Brooks's allegedly false trial testimony—to make a deal with the prosecutor to get out of jail—Brooks's transcribed statement denied the explanation in the note. Such a denial, in a more recent, detailed, and trustworthy statement, confirms the lack of trustworthiness of the note. We therefore disregard the allegations contained in the note in considering whether Caldwell's allegations entitle him to an evidentiary hearing.

## B.

We turn now to the second requirement, which is that Caldwell's petition must allege facts that would, if proven by a preponderance of the evidence, entitle Caldwell to

9

a new trial. *See Martin*, 825 N.W.2d at 740. Whether Caldwell is entitled to an evidentiary hearing turns on the legal standard governing the particular type of claim alleged in the petition. *See id.*; *Bobo*, 820 N.W.2d at 516-517 (explaining that "[t]o receive an evidentiary hearing on a postconviction claim of ineffective assistance of appellate counsel, a defendant is required to allege facts that . . . would satisfy the two-prong test announced in *Strickland v. Washington*," while "[t]o receive an evidentiary hearing on a . . . postconviction claim of newly discovered evidence, a defendant is required to allege facts that . . . would satisfy the four-prong test set forth in *Rainer v. State*"). Here, Caldwell alleges that three witnesses testified falsely, which is the type of allegation that we evaluate under the *Larrison* standard. *See State v. Caldwell*, 322 N.W.2d 574, 584-87 (Minn. 1982) (adopting the test set forth in *Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1928)); *see also Pippitt v. State*, 737 N.W.2d 221, 227 (Minn. 2007) (explaining that the *Larrison* test applies to witness recantations and, "more generally, . . . 'when a court reviews an allegation that false testimony was given at trial' " (quoting *Dukes v. State*, 621 N.W.2d 246, 257 (Minn. 2001))).

Under *Larrison*, a petitioner is entitled to a new trial based on false trial testimony if: (1) the court is reasonably well satisfied that the testimony given by a material witness was false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise when the false testimony was given and was unable to meet it or did not know that the testimony was false until after trial. *Caldwell*, 322 N.W.2d at 584-85. The first two prongs of the *Larrison* standard are

10

compulsory. *See Ferguson*, 645 N.W.2d at 444. The third prong is relevant but is not an "absolute condition precedent" to granting relief. *Id.* at 445.

Caldwell does not need to satisfy the *Larrison* standard at this stage of the proceeding. Rather, to determine whether Caldwell is entitled to an evidentiary hearing, we assume the truth of his allegations that bear sufficient indicia of trustworthiness and determine whether those allegations would be legally sufficient to entitle him to relief if they were proven at a hearing. *See Martin*, 825 N.W.2d at 740. If so, then Caldwell is entitled to a hearing. *See id.*; Minn. Stat. § 590.04, subd. 1 (requiring a postconviction court to grant an evidentiary hearing "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief"). If not, then the postconviction court did not abuse its discretion when it denied Caldwell's petition without an evidentiary hearing. *See State v. Nicks*, 831 N.W.2d 493, 511 (Minn. 2013). Accordingly, in a case involving allegedly false trial testimony, a petitioner is entitled to an evidentiary hearing if, assuming that the trustworthy allegations contained in the petition, files, and records are true, a court would conclude that a material witness's trial testimony was false and that the false testimony might have affected the verdict.[2]

---

[2]    According to the dissent, we "contend" that appellate courts must independently review the record and decide de novo if an alleged recantation justifies an evidentiary hearing. Of course, we contend no such thing. Instead, as our cases require, we evaluate the postconviction court's decision to deny an evidentiary hearing to Caldwell under an abuse-of-discretion standard. In this case, the postconviction court made an obvious error and thus abused its discretion when it concluded that the allegations in Caldwell's petition and the accompanying materials were insufficient to justify an evidentiary hearing.

11

1.

The first prong of the *Larrison* standard focuses on whether a material witness's testimony at trial was false. An evidentiary hearing is ordinarily required to determine the credibility of a recantation because a postconviction court must assume the truth of the allegations in a petition when it determines whether to grant an evidentiary hearing. *See Ferguson II*, 779 N.W.2d at 559-60. Stated differently, an evidentiary hearing is the means by which a court generally must determine the credibility of a witness. *See Bobo*, 820 N.W.2d at 516.

In this case, the postconviction court concluded that it was "not reasonably well satisfied by a preponderance of the evidence" that Brooks's or Carnell's trial testimony was false. Though the court recited the correct legal standard for evaluating Caldwell's request for an evidentiary hearing, it then failed to apply that standard correctly when it assessed the credibility of Caldwell's witnesses without the benefit of an evidentiary hearing. *See Martin*, 825 N.W.2d at 743. The dissent points out that the postconviction court denied making credibility determinations, as if that fact is somehow determinative. The problem, however, is that what the postconviction court *did* is not the same as what it *said*. It is not sufficient, as the dissent seems to imply, for a court simply to *state* the legal standard correctly. It must also *apply* that standard correctly. Here, after accurately stating the standard for an evidentiary hearing, the postconviction court "conflated the requirements for a postconviction evidentiary hearing with the requirements for a new trial" when it evaluated the credibility of Caldwell's witnesses without the benefit of an evidentiary hearing. *Id.* (emphases in original omitted).

12

To be sure, a postconviction court has discretion to deny an evidentiary hearing on grounds that are unrelated to a recanting witness's credibility—for example, when an alleged recantation does not actually contradict a witness's trial testimony. *Cf. Opsahl v. State* (*Opsahl II*), 710 N.W.2d 776, 782 (Minn. 2006) (holding that relief was unavailable in part because some recanting witnesses "reversed any recantation they may have made" and others "claim[ed] merely that they did not give a full explanation of their testimony at trial"). In such a situation, a petitioner would not be entitled to relief, regardless of what occurs at an evidentiary hearing. However, we have been clear that it is impermissible for a court to deny an evidentiary hearing in a witness-recantation case based on nothing more than its own speculation about whether the recantation is credible. *See Opsahl I*, 677 N.W.2d at 423-24. In this case, a review of each witness's trial testimony and alleged recantation indicates that such speculation, rather than the legal insufficiency of Caldwell's allegations, drove the court's decision to deny an evidentiary hearing.

At least two elements of Brooks's trial testimony—both of which he recanted in his statement—provided material evidence of Caldwell's guilt as an accomplice. First, Brooks testified at trial that Caldwell or Kirk said the One-Nines had shot at them earlier and that they "were going to get" them in retaliation. Second, Brooks testified at trial that Caldwell passed a gun to Kirk in the moments before the shooting. Brooks's statement directly contradicts his trial testimony on these two key facts.

The dissent suggests that Brooks's failure to say definitively, "Caldwell did not pass the gun to the shooter," undermines our conclusion that Brooks's recorded statement

13

constituted a recantation of the second point. We disagree. Brooks testified at trial that he saw "[Caldwell] pass[] Kirk the gun." In his recorded statement, when asked if he saw Caldwell pass a gun to Kirk, Brooks answered, "I couldn't really see anything. Cause if you going towards the door and the chair way you can't even see him pass him nothing." If Brooks's recorded statement is true and Brooks could not actually see what Caldwell was doing, then he could not have seen Caldwell pass the gun to Kirk. In other words, both statements cannot be true, and the contradiction between Brooks's statement and his trial testimony necessitates further inquiry into the credibility of his recantation.[3]

Moreover, in contrast to cases in which we have upheld a postconviction court's denial of an evidentiary hearing, here Brooks provided reasons for his recantation: he had lied at trial because he was upset that Kirk fired toward innocent bystanders, and he recanted because he was distressed that Caldwell was in prison for a crime that he did not commit. While Brooks's explanations for the recantation may be improbable and his statement expresses some uncertainty about the events surrounding the shooting, the postconviction court's decision to deny the petition was premature.

Caldwell's allegations regarding Carnell's and S.T.'s recantations further support our conclusion that the postconviction court denied the petition prematurely. Like

---

[3] The fact that Brooks substantively changed his testimony between the trial and his recorded statement distinguishes this case from those in which witnesses have merely forgotten facts from their testimony. It is one thing for a witness to *forget* key facts from his or her trial testimony, but it is entirely different for a witness to *contradict* key facts from his or her trial testimony, as our cases acknowledge. *See Dobbins*, 788 N.W.2d at 735 ("Because [the witness's] trial testimony and his subsequent statements to [an informant] are *inconsistent, one or the other is necessarily false*." (emphasis added)).

14

Brooks's statement, Carnell's statement repudiates his testimony that he saw Caldwell pass a gun to Kirk on the day of the shooting. Other details in Carnell's statement—that he either never saw a gun or did not recall seeing a gun and that he did not remember details about the shooting when he testified at trial—are in tension with his trial testimony, but, even if true, would not necessarily imply that he had lied at trial. S.T.'s statement also denies key facts from his trial testimony, including that he saw Caldwell in the aftermath of the shooting and that the gun used to kill Cole was one that belonged to Caldwell. Like Brooks, both witnesses explained their recantations: S.T. said that he had lied at trial in exchange for a suspended sentence on an unrelated charge but later decided that the police had taken advantage of him, and Carnell said that he recanted because he was upset that Caldwell had been convicted for a crime that he did not commit.

The dissent, based largely on its observation that neither witness stated "that they did not testify truthfully at trial," concludes that Brooks and Carnell did not actually recant their trial testimony. In the dissent's view, if a witness testified at trial, "A occurred," but then later stated that "A did not occur, but B did," we cannot conclude that the first statement is false unless the witness adds, "and by the way, I lied at trial." Fortunately, the dissent's overly formalistic view of witness recantations is not the law in Minnesota. *See, e.g.*, *Dobbins*, 788 N.W.2d at 734-35 (concluding that the first *Larrison* requirement could be satisfied by a witness's alleged statement that directly contradicted his trial testimony but *did not* explicitly admit to testifying falsely). For one thing, witnesses may be understandably reluctant to admit that they testified falsely under oath because perjury is a crime. *See* Minn. Stat. § 609.48, subd. 1(1) (2012). Evasive answers

15

by a witness do not necessarily mean that the witness did not testify falsely at trial or recant his or her testimony, as the dissent suggests. Rather, evasiveness is potentially relevant to whether a recantation is credible—a matter that the postconviction court is free to consider at an evidentiary hearing. *See Bobo*, 820 N.W.2d at 516 (describing an evidentiary hearing as "*the* means for evaluating the credibility of a witness" (emphasis added)).

Moreover, even if the dissent's strict definition of what constitutes a "recantation" were correct, the *Larrison* standard applies broadly to *all* allegations of false trial testimony, not just to witness recantations, *Pippitt*, 737 N.W.2d at 227, so the dissent's metaphysical discussion of recantations is ultimately beside the point. Thus, no matter how we label Caldwell's allegations—as allegedly false testimony or as recantations— the *Larrison* standard requires us to examine the substance of the witnesses' statements, rather than how the witnesses characterize their statements, to determine whether they may have testified falsely at trial. *See id.* (holding, following an evidentiary hearing, that the first *Larrison* prong was not satisfied when a witness claimed that he had testified falsely at trial but failed to provide any details or otherwise demonstrate which parts of his testimony were false). It is the substance of the conflicting statements of Carnell, Brooks, and S.T. that convinces us that Caldwell has made a sufficient showing that each of the three witnesses may have testified falsely at trial.[4]

---

[4] In addition to holding a misguided view of what constitutes a recantation, the dissent ignores relevant portions of the record when it argues that neither Carnell nor Brooks admitted that his trial testimony was false. For example, when the investigator

(Footnote continued on next page.)

The dissent nevertheless argues that mere contradictions between a witness's trial testimony and a later statement are insufficient to qualify as a recantation because we ultimately affirmed the denial of postconviction relief in both *Pippitt* and *Opsahl II*. *Pippitt*, 737 N.W.2d at 224; *Opsahl II*, 710 N.W.2d at 782. The dissent's argument, however, overlooks the fact that those cases involved credibility determinations by the postconviction court *after* an evidentiary hearing.[5] *Pippitt*, 737 N.W.2d at 224; *Opsahl*

---

(Footnote continued from previous page.)
asked Carnell if his testimony had been truthful, Carnell said "some of it was but like *some of it wasn't*." (Emphasis added.) Similarly, Brooks agreed with the investigator that the interview was scheduled only after Brooks "indicat[ed] that the testimony that [he] gave in Lincoln Caldwell's case may have been inaccurate." Brooks also stated that he had "change[d] [his] mind" about some of his testimony at trial.

[5]     In fact, the postconviction court's credibility determination was central to our decision in *Pippitt*. In *Pippitt*, the postconviction court relied on a witness's temporary inability to remember portions of his trial testimony at an evidentiary hearing to conclude that the witness, and thus his recantation, was not credible. *Pippitt*, 737 N.W.2d at 228-29. We affirmed the postconviction court's decision because the witness's selective recall at the hearing was a sufficient reason to doubt the credibility of the recantation. *Id.* Thus, far from constituting a "distinction without a difference," as the dissent contends, the fact that the postconviction court held an evidentiary hearing—which is "*the* means for evaluating the credibility of a witness," *Bobo*, 820 N.W.2d at 516 (emphasis added)— was essential to *Pippitt*.

Nevertheless, the dissent insists that *Pippitt* held that "a recantation requires more than a mere inability to remember or a simple statement contradicting earlier trial testimony." Notably, both parts of the dissent's characterization of *Pippitt* are at odds with the reasoning of the decision. After all, the witness in *Pippitt* ultimately *did* remember and testified at the evidentiary hearing, so his initial failure to remember was only relevant to his credibility and there would have been no basis on which to adopt a categorical rule of the type articulated by the dissent. *See* 737 N.W.2d at 228 ("[The witness] initially stated at the hearing that he could not remember whether the door even had a dead bolt. When shown a picture of the door, *he reported his memory being refreshed*, and confirmed that the door had a dead bolt and that his mother could lock it." (emphasis added)). And *Pippitt*'s abbreviated discussion of the witness's contradictory

(Footnote continued on next page.)

17

*II*, 710 N.W.2d at 780-81. Indeed, prior to *Opsahl II*, we had reversed the postconviction court's summary denial of Opsahl's petition because his allegations "m[et] the minimal standard for an evidentiary hearing." *Opsahl I*, 677 N.W.2d at 423-24. Thus, the procedural history of *Pippitt* and *Opsahl II*, both of which were decided following an evidentiary hearing, supports our conclusion that the postconviction court denied Caldwell's petition prematurely. Moreover, not only does the dissent's argument misinterpret *Pippitt* and *Opsahl*, it also conflicts with a number of other decisions in which we have remanded for an evidentiary hearing based on allegations that "if true, would suggest that [a witness's] trial testimony was *false*." *Ferguson II*, 779 N.W.2d at 559 (emphasis added); *see also Dobbins*, 788 N.W.2d at 735 (remanding for an evidentiary hearing after observing that, "[b]ecause [the witness's] trial testimony and his subsequent statements to [an informant] are inconsistent, one or the other is necessarily false"); *Wilson v. State*, 726 N.W.2d 103, 107 (Minn. 2007) ("In this case, an evidentiary

---

(Footnote continued from previous page.)
statement at the evidentiary hearing was nothing more than a reiteration of the straightforward principle that a witness's uncertainty and hazy memory during his or her testimony is a sufficient basis to doubt the witness's credibility. *See id.* at 228-29 ("When we compare the level of detail [the witness] provided about the front door during his trial testimony with his inability to remember, at the postconviction hearing, whether the door even had a dead bolt, we cannot be reasonably 'well-satisfied' that his trial testimony was false . . . ."). Our discussion cannot be read, as the dissent contends, as establishing a categorical rule that a contradiction between a witness's later statements and his or her trial testimony *cannot* constitute a recantation. *See id.* at 228 ("While that portion of [the witness's] postconviction testimony conflicts with his trial testimony, the conflict does not *necessarily* indicate that his trial testimony was false for purposes of the *Larrison* test." (emphasis added)).

18

hearing is appropriate because it is difficult if not impossible to test [the witness's] conflicting statements without examining [the witness] under oath.").

On this record, therefore, because we conclude that Caldwell's allegations, if proven, would be sufficient to satisfy the first prong of the *Larrison* standard, the postconviction court abused its discretion when it denied an evidentiary hearing to Caldwell based in part on its conclusion that the recantations from Brooks and Carnell were not credible.

2.

The second prong of the *Larrison* standard focuses on the impact of the false testimony on the verdict. Again, in the context of a request for an evidentiary hearing, we assume the truth of the petitioner's allegations, and therefore consider whether "the jury might have reached a different conclusion" absent the allegedly false testimony.[6] *Martin*, 825 N.W.2d at 740, 743. By "might," we mean "something more than an outside chance although much less than . . . would probably." *Caldwell*, 322 N.W.2d at 585 n.8 (internal quotation marks omitted). Rather than isolating each instance of allegedly false trial testimony, as under the first *Larrison* prong, the second prong examines the

---

[6]     In addressing the impact on the verdict, Caldwell argues that we should also consider new or alternative testimony from a witness. We disagree. We limit our analysis under *Larrison*'s second prong to the impact of the allegedly false testimony on the verdict, excluding from consideration the impact of any new or alternative testimony by a witness. *See, e.g.*, *Caldwell*, 322 N.W.2d at 585. Indeed, the limited focus of the *Larrison* standard distinguishes it from the *Rainer* standard, which applies to claims based on other types of newly discovered evidence, including new or alternative testimony from a witness. *Cf. Rainer v. State*, 566 N.W.2d 692, 695 (Minn. 1997). Caldwell does not seek relief under the *Rainer* standard.

19

combined impact on the verdict of all of the allegedly false trial testimony. *See, e.g.*, *Martin*, 825 N.W.2d at 744 (considering the evidence without the testimony of two recanting witnesses); *Opsahl I*, 677 N.W.2d at 424 (remanding for an evidentiary hearing because allegations that "challenge[d] the truth or believability of five out of seven witnesses" "call[ed] into question . . . a significant part of the state's . . . case").

The dissent repeatedly characterizes the changes in Brooks's and Carnell's testimony from the trial to their recorded statements as "minor." The dissent's characterization is unsupported by the record,[7] and more importantly, reflects a fundamental misunderstanding of the law of accomplice liability. To return a guilty verdict, the jury had to find, among other things: "(1) that [Caldwell] 'knew that [Kirk] w[as] going to commit a crime,' and (2) that [Caldwell] 'intended his presence or actions to further the commission of that crime.' " *State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012) (quoting *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007)). The critical evidence proving those two elements was the testimony of Brooks and Carnell that Caldwell passed a gun to Kirk before the shooting. Given the critical nature of their testimony and the dearth of other *comparable* evidence bearing on Caldwell's mental state, Caldwell's allegations, if proven, would be sufficient to determine that the jury may well have reached a different conclusion in the absence of the allegedly false testimony.

---

[7]  Nowhere is the speculation of the dissent more apparent than in footnote 22, which provides a long and convoluted explanation, full of assumptions and speculation, of how Brooks's testimony and his recorded statement may be less inconsistent than we suggest. A far simpler—and more sensible—explanation for Brooks's two contradictory accounts of the shooting is that either Brooks is not telling the truth now or he was not telling the truth at trial.

20

In addition to characterizing the changes in testimony as "minor," the dissent also claims that the testimony of other witnesses provided "ample" and even "abundant" evidence that Caldwell was guilty as an accomplice. Once again, the dissent misunderstands the law of accomplice liability, which required the State to prove beyond a reasonable doubt that Caldwell *knew* that Kirk was going to commit a crime and that Caldwell *intended* for his presence or actions to assist Kirk in the commission of that crime, *see Milton*, 821 N.W.2d at 805. The testimony relied upon by the dissent shows Caldwell's general involvement in the events before and after the shooting, but it bears only indirectly, and tenuously, on his mental state with regard to the shooting itself.

The dissent places particular emphasis on testimony that Caldwell's gang was engaged in a conflict with the One-Nines, that Caldwell was driving the SUV at the time of the shooting, that he drove toward the One-Nines and then drove away after Kirk fired the gun, and that Caldwell later took responsibility for Cole's death. The testimony establishes that Caldwell was a gang member, he was present for the shooting, and even that he may have bragged to others about his gang exploits. It does not establish, however, that Caldwell knew that Kirk would commit a crime or that he intended his actions to further the commission of that crime, except through several layers of speculation. Brooks's and Carnell's testimony, by contrast, provided a direct connection between Caldwell's actions (and by extension, his mental state) and the actual crime that Kirk committed. None of the evidence relied upon by the dissent can provide such a connection.

In fact, without the allegedly false trial testimony of the three witnesses, the jury would have heard *no* evidence that Caldwell provided a gun to the shooter. The dissent apparently considers it significant that "one [could] reasonably infer" that Caldwell passed a gun to Kirk based on the events leading up to the shooting. But as we have explained, "the second *Larrison* prong does not ask whether the evidence was sufficient to convict the defendant in the absence of the recanted testimony. The question instead is whether the jury *might* have found the defendant not guilty if the recanting witness had not testified [falsely]." *State v. Turnage*, 729 N.W.2d 593, 599 (Minn. 2007) (emphasis added); *accord Martin*, 825 N.W.2d at 744. Therefore, regardless of whether the dissent's inference is reasonable, the important fact is that the jury would have needed to rely on such inferences, rather than the direct evidence provided by Brooks's and Carnell's testimony, to conclude that Caldwell was even aware that Kirk had a gun. *Compare Dobbins*, 788 N.W.2d at 735-36 ("Because the State had little other direct evidence against [the petitioner], and [the petitioner's] theory of the case was credible, we conclude the jury might have reached a different conclusion had [the witness's] alleged false testimony not been admitted." (citation omitted) (internal quotation marks omitted)), *with Hooper v. State*, 680 N.W.2d 89, 96 (Minn. 2004) (concluding that a recantation regarding a confession did not satisfy the second prong of the *Larrison* test because two other witnesses also heard the defendant confess, a witness who was present during the crime testified about the defendant's actions, and several pieces of physical evidence directly connected the defendant to the crime).

The allegedly false trial testimony thus provided a basis for the jury's conclusion that Caldwell "knew that [Kirk] w[as] going to commit a crime" and "intended his presence or actions to further the commission of that crime." *Mahkuk*, 736 N.W.2d at 682. We therefore conclude that the jury might have reached a different conclusion regarding Caldwell's guilt if it had not heard the allegedly false testimony from the witnesses at trial.

3.

The final, noncompulsory prong of the *Larrison* standard focuses on the petitioner's knowledge of the alleged falsity of the testimony at the time of trial. Because Caldwell was indisputably present for the events that formed the basis for the allegedly false testimony, he does not argue that he was taken by surprise by the false testimony at trial, that he was unable to counter it at trial, or that he did not know of its falsity until after trial. Nevertheless, we have held that a petitioner's failure to allege facts that would satisfy *Larrison*'s third prong does not prevent a petitioner from receiving an evidentiary hearing or a new trial. *See, e.g.*, *Ferguson II*, 779 N.W.2d at 561-62. Thus, Caldwell's failure to allege such facts does not "conclusively show that [he] is entitled to no relief," and does not justify the postconviction court's denial of his request for an evidentiary hearing. Minn. Stat. § 590.04, subd. 1.

III.

For the foregoing reasons, we reverse the decision of the postconviction court and remand for an evidentiary hearing on Caldwell's witness-recantation claim.

Reversed and remanded.

23

D I S S E N T

DIETZEN, Justice (dissenting).

In reversing the postconviction court, the majority dismisses crucial portions of the record, misconstrues the relevant case law, and misapplies the standard of review. Carnell Harrison and William Brooks did not recant their trial testimony or state that they did not testify truthfully at trial. Instead, when asked whether they testified truthfully at trial, Carnell stated he could not remember and Brooks did not answer the question. Citing *Pippitt v. State*, 737 N.W.2d 221, 228-29 (Minn. 2007), the postconviction court concluded that an alleged inability to remember is legally insufficient to satisfy the first prong of the *Larrison* recantation test. The court alternatively concluded that Caldwell failed to satisfy the second prong of the *Larrison* test because, even in the absence of the allegedly false testimony, the jury would have reached the same verdict based on the testimony of several other important witnesses. Without affording any deference to the postconviction court, the majority concludes that Caldwell is entitled to an evidentiary hearing. In reaching that conclusion, the majority relies on minor inconsistencies in the witnesses' trial testimony and taped interviews, and dismisses the trial testimony of six important witnesses.

The majority's analysis of the first *Larrison* prong is flawed for three reasons. First, the majority dismisses Carnell and Brooks's responses to the crucial question of whether they testified truthfully at trial. Second, the majority misconstrues the relevant case law by suggesting that a simple contradiction in a witness's trial testimony and subsequent statement is sufficient, *by itself*, to satisfy the first prong of the *Larrison* test.

D-1

Third, the majority affords no deference to the postconviction court's application of *Pippitt* to the facts alleged in the taped interviews.

The majority's analysis of the second *Larrison* prong is also flawed for two reasons. First, the majority dismisses the trial testimony of six important witnesses. Second, the majority affords no deference to the postconviction court's conclusion that, even in the absence of the allegedly false testimony, the jury would have reached the same verdict based on the testimony of other important witnesses. This lack of deference is especially troubling because the postconviction court had the opportunity to personally observe all the trial testimony, and therefore was uniquely qualified to assess the impact of the allegedly false testimony.

In my view the record plainly supports the decision of the postconviction court to deny the petition without an evidentiary hearing. To explain the basis for my dissent, I will first clarify the record before our court, and then discuss my disagreement with the majority opinion.

I.

Caldwell argues that he is entitled to a new trial because the State's key witnesses, Carnell and Brooks, recanted their trial testimony or otherwise testified falsely at trial. To fairly address Caldwell's argument, an accurate understanding of the witnesses' trial testimony, their subsequent taped interviews, and the postconviction court's analysis is required.

At trial, Carnell testified that Caldwell owned the gun that killed Brian Cole and that Caldwell "gave [the gun] to [the shooter]." In describing how Caldwell passed the

gun to the shooter, Carnell said, "I think over the seat." During cross-examination, Carnell admitted that he was drunk at the time of the incident, and admitted he told a police investigator "[he] was like really drunk, like kind of blurry." Brooks testified at trial that Caldwell passed the gun to the shooter "between the [car] door and the chair." But when asked if he saw the transfer "with [his] own eyes," Brooks provided a nonresponsive answer. When asked, "Did you see where [Caldwell] pulled the gun from . . . before he handed it back to [the shooter]," Brooks replied, "No." During cross-examination, Brooks admitted he told the grand jury, "I guess [Caldwell] passed [the shooter] the gun."

Six other important witnesses testified for the State at trial, namely Cey Barber, Troy Young, B.M., E.F., P.P. and C.P. Collectively, these witnesses established the following facts. Caldwell and the shooter were members of a street gang that "ha[d] a problem" with the "One-Nine" gang.[1] When Caldwell and his group stood on the corner of Eighth Street and Penn Avenue talking with some girls, one of the girls said, "[H]ere come the One-Nines, you all better leave,"[2] and they observed a large group of One-Nines approaching on foot.[3] Because Caldwell and his group were outnumbered, they

---

[1]     This fact was established by Cey Barber, Trial Tr. at 689, and C.P., Trial Tr. at 714-15.

[2]     This fact was established by Troy Young, Trial Tr. at 563.

[3]     This fact was established by Troy Young, Trial Tr. at 562, and Cey Barber, Trial Tr. at 692.

fled one block west along Eighth Street and climbed into Caldwell's SUV.[4] Meanwhile, the One-Nines had turned east on Eighth Street.[5] Caldwell drove east along Eighth Street.[6] Moments later the shooter shouted, "[T]here go the One-Nines."[7] Caldwell then drove slowly past the One-Nines as the shooter fired several shots.[8] Immediately after the shooting, Caldwell sped away without saying anything or otherwise expressing surprise that the shooter had fired on the One-Nines.[9] A few weeks after the shooting C.P. overheard Caldwell bragging about killing the kid on Eighth and Penn.[10] More specifically, C.P. told police that Caldwell "was bragging about shooting a dude saying that he shouldn't have shot him because he was just a nobody, just a plain basketball kid. He was really looking for other Mook, One-Nine Mook."[11] When defense counsel cross-examined C.P. regarding his use of the pronoun "he," C.P. clarified that Caldwell had

---

[4]    This fact was established by Cey Barber, Trial Tr. at 694.

[5]    This fact was established by E.F., Trial Tr. at 412.

[6]    This fact was established by Troy Young, Trial Tr. at 571, Cey Barber, Trial Tr. at 696, and B.M., Trial Tr. at 521.

[7]    This fact was established by Cey Barber, Trial Tr. at 697.

[8]    This fact was established by P.P., Trial Tr. at 542-43.

[9]    This fact was established by Troy Young, Trial Tr. at 591.

[10]    This fact was established by Detective Nancy Dunlap, Trial Tr. at 444, and C.P., Trial Tr. at 725.

[11]    Trial Tr. at 725-26.

said, "[W]e shouldn't have shot him."[12] P.P. also testified that Caldwell told him "I'm the reason why you got that shirt," referring to a t-shirt honoring the victim, Brian Cole.[13]

In closing argument, the prosecutor argued the State had established aiding and abetting liability, emphasizing that Caldwell drove "right to the One-Nines," "slowed down for that shooting," and then "sped off to get away." The prosecutor also relied on Carnell and Brooks's testimony that Caldwell had passed the gun to the shooter. Defense counsel told the jurors they should believe the testimony of three of the State's witnesses, namely Cey Barber, Troy Young and E.F., because they had nothing to gain.[14] Defense counsel then vigorously attacked the credibility of Brooks and Carnell. With regard to Brooks, defense counsel told the jurors,

> On September 14th of 2007, he tells law enforcement, I guess [Caldwell] passed [the shooter] the gun. Let's see, this act happens on June 17th of 2006, so what's this, about a year and a couple months after the event, he first says, I guess. Then under oath he's questioned again, I guess [Caldwell] passed the gun to [the shooter]. [The shooter] leaned out the window and just opened fire. Then later he says, yes, I saw [Caldwell] pass the gun. I guess it's one of those things that happened in society that if you start saying stuff over and over again, it comes true? That makes no sense. Under oath, I guess. To the police, I guess. Then later, oh, yeah, I saw it . . . .[15]

---

[12]    Trial Tr. at 726.

[13]    Trial Tr. at 548.

[14]    Trial Tr. at 793-94, 800-02, 809-11.

[15]    Trial Tr. at 797.

As for Carnell, defense counsel emphasized that Carnell admitted that at the time of the shooting he was "[d]ozing in and out drunk" and that he told the police, "I am prepared to tell the truth if I'm not getting charged for nothing. Drop my charges."

The jury found Caldwell guilty as charged. The district court convicted Caldwell of the most serious count, first-degree murder for the benefit of a gang, and sentenced him to life in prison without the possibility of release. On direct appeal, petitioner did not challenge the sufficiency of the State's evidence on the issue of aiding and abetting. Instead, he argued the shooter lacked the necessary premeditation and intent to commit first-degree murder. *State v. Caldwell*, 803 N.W.2d 373, 383-84 (Minn. 2011). We affirmed. *Id.* at 397.

On May 29, 2012, Caldwell filed his current petition for postconviction relief. In support of his petition, Caldwell submitted transcripts of taped interviews of Carnell and Brooks that were conducted by a defense investigator.[16] During the interview with Carnell, the following colloquy occurred.

| Investigator: | Ok and the testimony, just to be clear, the testimony you gave in court was that inaccurate? |
|---|---|
| Carnell: | What I say in the court? |
| Investigator: | What you testified in court, was that truthful testimony? |
| Carnell: | I say what I say, are you talking about everything I said? |

---

[16]    Caldwell also submitted an affidavit from the defense investigator in which he swore the transcripts accurately reflected the interviews.

| | |
|---|---|
| Investigator: | Yeah when you testified against [Caldwell] was that truthful? |
| Carnell: | *Ah I can't remember. I can't like it's been so long ago.* I believe some of it was but like some of it wasn't cause the part that wasn't was the part that I didn't remember like *I was like drunk through the situation, you know what I mean.* So I didn't really remember I was just trying to put it together like how I thought I went it or whatever. But I really didn't remember and I can barely, it's been so long that I can barely put it together again now cause it's like the first time it came back up, you know what I mean, six years. But I am putting it together the best of my ability now without being under no pressure, without being threatened with no time, you know what I mean, or threatened with a murder or nothing like that, I can put it together I think a little better than I put it together back then because I'm under no pressure. |

Exhibit B (emphasis added). A similar colloquy occurred during the interview with Brooks.

| | |
|---|---|
| Investigator: | And part of the reason he got the sentence is because of your testimony, is that correct? |
| Brooks: | Yeah. |
| Investigator: | And was that testimony truthful? |
| Brooks: | Uh page 3 was, hold on a sec . . . . You talking about I'm trying to find where the part is that says about them arguing and then Kurt was arguing about something. I wasn't like by there to hear them arguing about anything. Cause I was like kinda drunk cause they had a little liquor. |

Exhibit A. Neither Brooks nor the investigator ever return to the question of whether Brooks testified truthfully at Caldwell's trial. They did, however, have the following discussion about the gun transfer.

| | |
|---|---|
| Investigator: | Where did [the shooter] get the gun? |
| Brooks: | I really don't know if the gun was just sitting on the side or if [Caldwell] passed it to him. I really don't know. |

.  .  .  .

| | |
|---|---|
| Investigator: | Ok did you see [Caldwell] pass [the shooter] the gun? |
| Brooks: | I couldn't really see anything. *Cause if you going towards the door and the chair way you can't even see him pass nothing.* |

Exhibit A (emphasis added). Brooks told the investigator: "I don't know if [Caldwell] even passed the gun to Kirk . . . . [T]hat's why . . . *I said in my testimony, 'I guess he passed him the gun on the side.'* " Exhibit A (emphasis added). The postconviction court accurately stated that a request for a new trial based on recantation, or false testimony of a witness, is evaluated under the *Larrison* test, which requires (1) the court be reasonably well satisfied that the trial testimony was false, (2) without the false testimony, the jury might have reached a different conclusion, and (3) the petitioner was taken by surprise at trial or did not know of the falsity until after trial. *State v. Caldwell*, 322 N.W.2d 574, 584-85 (Minn. 1982). Indeed, to recant means to withdraw or renounce prior statements or testimony formally or publicly. *Black's Law Dictionary* 1295 (8th ed. 2004). Citing *Ferguson v. State*, 645 N.W.2d 437, 445 (Minn. 2002), the postconviction court expressly acknowledged that the showing required to obtain a postconviction evidentiary hearing on a false-evidence claim was lower than the showing required to obtain a new trial. More specifically, the postconviction court explained that Caldwell was entitled to an evidentiary hearing if he alleged facts that, if proved by a preponderance of the evidence,

would entitle him to relief under the *Larrison* test. *See* Minn. Stat. § 590.04, subd. 1 (2012); *Ferguson*, 645 N.W.2d at 445.

The postconviction court relied upon *Pippitt v. State*, 737 N.W.2d 221, 228-29 (Minn. 2007) to conclude that an "inability to recall" is legally insufficient to satisfy the first prong of the *Larrison* test that the court must be reasonably well-satisfied that the testimony in question was false. The court determined that "[Carnell] never recants his trial testimony," emphasizing that "when specifically asked if his trial testimony was truthful, [Carnell] states that he cannot remember and he is just trying to remember what happened to the best of his ability." Similarly, the court determined "Brooks never recants his trial testimony or admits that he lied in the recorded statement; he simply indicates that parts of his testimony may have been inaccurate because he no longer remembers the events of that day."[17]

With regard to the second *Larrison* prong, the postconviction court concluded that even in the absence of the allegedly false testimony, the jury would have reached the same verdict because the testimony of several other important witnesses provided independent proof of Caldwell's intent to further the commission of the crime. The court emphasized the following testimony. B.M. and P.P. testified Caldwell was driving the SUV. E.F. and P.P. testified the group that was shot at consisted of members of the One-

---

[17] The postconviction court concluded that an affidavit from a third witness, S.T., did not warrant an evidentiary hearing because S.T.'s trial testimony was not material or pivotal. *See Hooper v. State*, 680 N.W.2d 89, 96 (Minn. 2004) (affirming the postconviction court's decision not to hold an evidentiary hearing because the recanting witness's testimony was not pivotal). That conclusion is sound.

Nine gang and that Caldwell had issues with that gang. Cey Barber testified the shooter "identified the group as members of the [One-Nine] gang and after that comment, [Caldwell] drove the car toward, the group." Finally, C.P. and P.P. testified they heard Caldwell make comments following the murder indicating that he was involved.

Having clarified the record before the court, I now discuss my disagreement with the majority opinion.

## II.

The majority dismisses the responses Carnell and Brooks gave in their taped interviews when they were directly asked whether their trial testimony was truthful. The majority contends, without citation, that a recanting witness need not publicly renounce his or her prior testimony with a statement like, "and by the way, I lied at trial." *Supra* at 15. But this is not a case in which the witnesses simply failed to state that they lied at trial. Instead, it is a case in which the witnesses evaded direct questions on the issue of whether they testified truthfully at trial. In my view, the postconviction court properly considered the responses Carnell and Brooks gave in their taped interviews when they were directly asked whether their trial testimony was truthful.

## III.

Having dismissed the witnesses' response to the critical question of whether their trial testimony was truthful, the majority plucks a handful of minor inconsistent statements from the interview transcripts that it contends support a claim of false trial testimony. In support of its contention, the majority cites *Dobbins v. State*, 788 N.W.2d 719, 735 (Minn. 2010), and *Ferguson v. State* (*Ferguson II*), 779 N.W.2d 555, 559-60

D-10

(Minn. 2010), for the proposition that a contradiction in a witness's trial testimony and subsequent statement is sufficient, *by itself*, to warrant an evidentiary hearing on the first prong of the *Larrison* test. *Supra* at 14 n.3, 18.

The majority misconstrues *Dobbins* and *Ferguson II*. Specifically, the majority ignores the broader totality of the circumstances approach adopted in *Dobbins* and *Ferguson II*, and substitutes a wooden rule that all minor inconsistent statements merit an evidentiary hearing regardless of context. In *Dobbins*, we acknowledged that the conflict between the witness's trial testimony and subsequent statement made "one or the other . . . false." 788 N.W.2d at 735. But we did not end our analysis there. Instead, we considered "the context of the two inconsistent statements," which included the reduced sentence the witness received in exchange for his trial testimony and the fact that the witness made the subsequent statement to a friend. *Id.* We observed that the reduced sentence provided the witness an incentive to blame the murder on Dobbins and there was "likely a high probability that [the witness] would tell a friend the truth." *Id.* We held that "under these circumstances," a court could be reasonably well satisfied that it was the trial testimony, not the subsequent statement, that was false. *Id.* Similarly, we considered the context of the inconsistent statements in *Ferguson II*. *See* 779 N.W.2d at 560. Those circumstances included a claim that the police secured the witness's trial testimony by threatening to take away his children and imprison the mother of his children. *Id.* at 558. Like the circumstances in *Dobbins*, these alleged threats could cause a court to be reasonably well satisfied that it was the trial testimony, not the subsequent statement, that was false.

Here, Brooks's subsequent statement was not made to a friend, and nobody offered him a deal. Rather, Brooks was motivated by his belief that Caldwell was sentenced to "life for something he didn't really do . . . . He was like involved a little but at the same time you can't just give a man life. He didn't kill no one. He got more time than the person who killed him." Essentially, Brooks questions the policy judgment of the Legislature regarding aiding and abetting liability. The postconviction court correctly concluded "feeling sorry that your friend is in prison is not sufficient assurance that you are now telling the truth, especially since Brooks still admits that [Caldwell] was involved in the murder." Thus, the circumstances surrounding the inconsistent statements in *Dobbins* and *Ferguson* are not present in Caldwell's case.[18] By remanding this case for an evidentiary hearing, the majority effectively holds that any minor contradiction in a witness's trial testimony and subsequent statement is sufficient, *by itself*, to warrant an evidentiary hearing. Such a holding, however, overrules our conclusion in *Opsahl v. State* that "a simple statement contradicting earlier testimony is not sufficient" to satisfy the first prong of the *Larrison* test. 710 N.W.2d 776, 782 (Minn. 2006); *see also Ferguson II*, 779 N.W.2d at 559 (reaffirming that "a simple statement

_____

[18] Moreover, the majority relies on several statements that are not actually contradictory. For example, Brooks testified at trial that Caldwell passed the murder weapon to the shooter, while at the time of his taped interview he said, "I really don't know if the gun was just sitting on the side or if [Caldwell] passed it to [the shooter]. I really don't know." Importantly, Brooks never said that Caldwell did not pass the gun to the shooter. Admittedly, Brooks stated that he has "change[d] [his] mind" about some of his testimony at trial. *Supra* at 17 n.4. But that statement does not suggest that Brooks provided testimony that he knew was false at the time of trial. Rather, it suggests that sometime after the trial ended he has begun to question some of his testimony.

contradicting earlier testimony is insufficient to establish the petitioner's right to a new trial").

IV.

Finally, the majority misapplies the standard of review when it affords no deference to the postconviction court's determination that the facts alleged in the taped interviews, if believed, would not have changed the result obtained at trial. A postconviction court's decision not to hold an evidentiary hearing is reviewed for abuse of discretion, not de novo. *Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012). In *Reed v. State*, we identified three ways in which a postconviction court might abuse its discretion. 793 N.W.2d 725, 729 (Minn. 2010). Under the abuse of discretion standard, a matter will not be reversed unless the postconviction court (1) based its ruling on an erroneous view of the law, (2) made clearly erroneous findings, or (3) exercised its discretion in an arbitrary or capricious manner. *Id.* at 729; *see Montanaro v. State*, 802 N.W.2d 726, 731 n.6 (Minn. 2011). Put differently, to determine whether the postconviction court abused its discretion, an appellate court must examine whether the postconviction court erred in identifying the controlling law for the case, determining the applicable facts, and applying the proper law to the relevant facts. I will discuss each of the *Reed* categories in turn.

A.

The question of whether the postconviction court correctly identified the controlling law for a case is a question of law that we review de novo. *Riley*, 819 N.W.2d at 167. The postconviction court correctly identified the *Larrison* test and our decisions

D-13

in *Ferguson*, 645 N.W.2d at 445, and *Pippitt*, 737 N.W.2d at 228-29, as relevant to deciding whether to grant an evidentiary hearing. The majority concedes, and I agree, that the postconviction court correctly identified the *Larrison* test and *Ferguson* as controlling law in this case. In my view, the postconviction court also correctly relied upon *Pippitt* to conclude that the "inability to recall" is legally insufficient to satisfy the first prong of the *Larrison* test.

The issue in *Pippitt* was whether a witness's "postconviction testimony *constitute[d]* a recantation." 737 N.W.2d at 228 (emphasis added). We concluded that it did not. *Id.* The witness "did not state at the postconviction hearing that his trial testimony was false." *Id.* Instead, the witness testified that he could not remember whether the door in question had a dead bolt lock. *Id.* We held that such testimony did not constitute a recantation for purposes of the *Larrison* test. *Id.* More specifically, we said, "[w]hen we compare the level of detail [the witness] provided about the front door during his trial testimony with his inability to remember, at the postconviction hearing, whether the door even had a dead bolt, we cannot be reasonably 'well-satisfied' that his trial testimony was false, as required by the *Larrison* test." *Id.* at 228-29.

We acknowledged the witness later reported his memory of the lock had been refreshed by a photograph. *Id.* at 228. Nevertheless, we held that the conflict between his refreshed memory and his trial testimony did not constitute a recantation. We concluded that the conflicting testimony in *Pippitt* did not "indicate that [the witness's] trial testimony was false for purposes of the *Larrison* test." *Id.* In doing so we relied

D-14

upon the *Opsahl* rule that "a simple statement contradicting earlier testimony" does not satisfy the first prong of *Larrison*. 710 N.W.2d at 782.

In sum, we held in *Pippitt* that the witness's postconviction testimony was legally insufficient to satisfy the *Larrison* test because the witness never renounced his trial testimony. We reasoned that a recantation requires more than a mere inability to remember or a simple statement contradicting earlier trial testimony.[19] Consequently, *Pippitt* supports the postconviction court's legal conclusion that an "inability to recall" is insufficient to satisfy the first prong of the *Larrison* test. Because the postconviction court's decision was not based on an erroneous view of the controlling law, the first *Reed* category does not warrant a reversal in this case.

---

[19] The majority's efforts to distinguish *Pippitt* on procedural grounds are unavailing. It is true that in *Pippitt* our discussion of whether an inability to remember was legally insufficient to satisfy the first prong of the *Larrison* test was based on facts found after a postconviction evidentiary hearing, rather than facts alleged in a postconviction petition. 737 N.W.2d at 228-29. Here, that is a distinction without a difference. The postconviction court *assumed* that Brooks and Carnell were telling the truth when they told the defense investigator that they could not remember. Had the postconviction court held an evidentiary hearing and *found* that Brooks and Carnell were telling the truth when they told the defense investigator that they could not remember, the postconviction court's legal analysis would have remained unchanged. Put differently, the legal principle expressed in our discussion in *Pippitt* is the same whether the inability to remember is assumed to be true before an evidentiary hearing or found to be true after an evidentiary hearing. Moreover, the majority's contention that the postconviction court's "credibility determination" was central to our decision in *Pippitt* is incorrect. Nowhere in our discussion of Pippitt's *Larrison* claim did we use the words "credible" or "credibility." Moreover, we did not mention, much less apply, the clearly erroneous standard, which controls our review of credibility determinations. Instead, we focused on the legal soundness of Pippitt's argument that the witness's postconviction testimony "constitute[d] a recantation."

B.

The second *Reed* category requires us to consider whether the postconviction court made any clearly erroneous findings of fact. Generally, to determine whether an evidentiary hearing is necessary under section 590.04, a court must consider whether the facts alleged in the petition, *if proved by a preponderance of the evidence*, would entitle the petitioner to relief. *See* Minn. Stat. § 590.04, subd. 1 (2012); *Ferguson*, 645 N.W.2d at 445. The evidence presented to the postconviction court consisted of taped interviews of Carnell and Brooks. Consistent with section 590.04, the postconviction court did not make any findings of fact to which we must defer. Instead, the court assumed that Brooks and Carnell were telling the truth when they told the defense investigator that they could not clearly remember the circumstances surrounding the shooting. When asked if he testified truthfully at trial, Carnell answered: "Ah I can't remember. I can't like it's been so long ago." Brooks answered the question this way: "I wasn't like by there to hear them arguing about anything. Cause I was like kinda drunk cause they had a little liquor." Because the court did not make any factual findings, much less any clearly erroneous findings, the second *Reed* category does not warrant a reversal.[20]

---

[20] The majority incorrectly alleges that the postconviction court made factual findings. More specifically, the majority alleges that the postconviction court "conflated the requirements for a *postconviction evidentiary hearing* with the requirements for a *new trial*" when the postconviction court stated that it was not "reasonably well satisfied" that Carnell and Brooks's testimony was false. The majority contends that the postconviction court "failed to apply [the recited] standard correctly when it assessed the credibility of Caldwell's witnesses without the benefit of an evidentiary hearing." *Supra* at 12. Not only does the record fail to support the majority's contention, it directly contradicts that contention. The postconviction court expressly acknowledged that (1) the showing

(Footnote continued on next page.)

C.

Third, I consider whether the postconviction court's decision reflects an arbitrary or capricious application of the law to the facts presented in the petition to the postconviction court. The decision to grant an evidentiary hearing rests upon the determination of whether the petitioner has presented sufficient evidence that, if believed, would probably change the result obtained at trial. We review that determination for an abuse of discretion.[21]

---

(Footnote continued from previous page.)
required to obtain a postconviction evidentiary hearing on a false-evidence claim is lower than the showing required to obtain a new trial, and that (2) the decision to grant or deny a postconviction evidentiary hearing must be made without resolving factual disputes regarding credibility. For example, when discussing Brooks's statement that he felt sorry for Caldwell, the postconviction court said "*without making any credibility determinations*, feeling sorry that your friend is in prison is not sufficient assurance that you are now telling the truth, especially since Brooks still admits that [Caldwell] was involved in the murder." (Emphasis added.)

[21] The majority muddles the abuse of discretion standard of review of postconviction petitions. Specifically, the majority contends that the de novo standard of review applies to whether a petitioner is entitled to an evidentiary hearing on a claim of recantation, or false testimony of a witness. Indeed, the majority contends that the court must independently review the record to determine whether the alleged recantation contradicts the witness's trial testimony. This is not an abuse of discretion standard of review; instead it is de novo review. Put differently, if the only relevant question in deciding whether to hold an evidentiary hearing is reviewed de novo, what discretion does a postconviction court exercise when it decides not to hold an evidentiary hearing? The majority's answer is none; instead, the majority proposes de novo review with no deference to the postconviction court. But we have repeatedly stated that we review a postconviction court's decision not to hold an evidentiary hearing for abuse of discretion. *See, e.g.*, *State v. Hooper*, 838 N.W.2d 775, 786 (Minn. 2013); *State v. Nicks*, 831 N.W.2d 493, 503 (Minn. 2013); *Fort v. State*, 829 N.W.2d 78, 82 (Minn. 2013). The majority effectively overrules *Hooper*, *Nicks,* and *Fort* when it states that the legal sufficiency of Caldwell's allegations is a question of law that does not require the exercise of any discretion.

The postconviction court applied the legal principle expressed in *Pippitt*—that an "inability to remember" is legally insufficient to satisfy the first prong of the *Larrison* test—to the facts of Caldwell's case. Notably, neither Carnell nor Brooks renounced their trial testimony, or stated that they testified falsely at trial. In fact, both witnesses are very sketchy over whether they intended to recant or change any portion of their testimony. Based on the record in this case, I conclude that the postconviction court's decision to deny Caldwell's request for an evidentiary hearing does not reflect an arbitrary or capricious application of *Pippitt* to the facts alleged in the petition, and therefore the third *Reed* category does not warrant a reversal in this case.[22]

---

[22] Affording no deference to the postconviction court's determination, the majority finds that "Brooks substantively changed his testimony between the trial and his recorded statement." *Supra* at 14 n.3. In my view, the differences between Brooks's trial testimony and the taped interview are minor and not sufficient to warrant an evidentiary hearing. As part of his trial testimony, Brooks conceded that during the grand jury proceedings he testified, "I guess [Caldwell] passed Kirk the gun." In his recorded statement, Brooks said, "I don't know if [Caldwell] even passed the gun to Kirk . . . . [T]hat's why . . . I said in my testimony, 'I guess he passed him the gun on the side.'" Similarly, Brooks testified at trial that Caldwell passed the gun to the shooter "between the [car] door and the chair." He did not testify that his view was not obstructed by the driver's chair as the gun passed between the left side of the driver's chair and the car door. In fact, when asked if he saw the transfer with his own eyes, Brooks provided a nonresponsive answer. In his taped interview, Brooks told the investigator that he couldn't really *see* anything "[c]ause if you going towards the door and the chair way you can't even see him pass him nothing." But that statement simply acknowledges the obvious fact that a driver's chair blocks the rear middle passenger's view as an object passes between left side of the driver's chair and the car door. The fact that Brooks did not "see" the gun pass between the hands of Caldwell and the shooter does not make Brooks's testimony that Caldwell passed the gun to the shooter "between the [car] door and the chair" false. This is especially true when one can reasonably infer that the driver passed his gun to the person directly behind the driver if the driver reaches between the driver's chair and the car door and minutes later the person sitting behind the driver starts

(Footnote continued on next page.)

D-18

V.

Moreover, even if the postconviction court's reliance on *Pippitt* was misplaced, a reversal is not warranted because the minor inconsistencies between the witnesses' trial testimony and taped interviews do not satisfy the second prong of the *Larrison* test.

Under the second prong, a petitioner must allege facts that, if proved, would demonstrate that the jury might have reached a different conclusion absent the allegedly false testimony. *Martin v. State*, 825 N.W.2d 734, 740 (Minn. 2013). By "might" we mean "something more than an outside chance although much less than . . . would probably." *Caldwell*, 322 N.W.2d at 585 n.8 (internal quotation marks omitted). In applying "the second prong, we consider only the impact that [the witness's] allegedly false testimony had on the jury, rather than guess what impact the substance of [the] recantation would have on the jury." *Dobbins*, 788 N.W.2d at 733 n.4. The existence of ample evidence independent of the false testimony will support a conclusion that the defendant "has failed to establish that, without [the false testimony], the jury might have reached a different conclusion." *Hooper v. State*, 680 N.W.2d 89, 96 (Minn. 2004). In *Hooper*, the false testimony "went directly to [the defendant's] guilt." *Id.* Nevertheless, we concluded the defendant failed to establish that, without the false testimony, the jury might have reached a different conclusion because two other witnesses testified that the

_____

(Footnote continued from previous page.)
firing the driver's gun out the window. Thus, the difference between Brooks's trial testimony and his recorded statement is not as substantial as the majority suggests.

defendant had confessed to them and the State's other evidence placed the defendant at the scene of the murder. *Id.*

Having carefully reviewed the record in this case, I conclude the district court did not abuse its discretion when it concluded that Caldwell failed to establish that in the absence of the allegedly false testimony, the jury might have reached a different verdict. The impact of the allegedly false testimony of Brooks and Carnell was blunted by defense counsel's cross-examination of those witnesses. During the questioning, Carnell conceded that he was drunk at the time of the shooting and that he later told a police investigator that "[he] was like really drunk, like kind of blurry." Similarly, Brooks conceded that he told the grand jury, "I guess [Caldwell] passed Kirk the gun."

Additionally, the jurors heard the testimony of Cey Barber, Troy Young and E.F. Defense counsel repeatedly told the jurors that they should believe Barber, Young and E.F. The cumulative testimony of Barber, Young and E.F. established that Caldwell and the shooter were members of a street gang that "ha[d] a problem" with the "One-Nine" gang. On the date in question, Caldwell and his group were at the corner of Eighth Street and Penn Avenue and observed a large group of One-Nines approaching them on foot. Caldwell's group saw they were outnumbered, fled west along Eighth Street and climbed into Caldwell's SUV, and Caldwell then drove east along Eighth Street. Moments later the shooter in Caldwell's SUV shouted, "[T]here go the One-Nines." In response, Caldwell drove toward the One-Nines "going slow," and as he was "going past" the shooter fired several shots. Caldwell then sped away without saying anything or otherwise expressing surprise that the shooter had fired on the One-Nines. The jurors

D-20

also heard the testimony of B.M., who said that Caldwell was driving the vehicle from which the shots came. And the jury heard from P.P. and C.P., who told the jurors that they heard Caldwell make separate comments following the murder indicating that he was responsible for the victim's death.

As in *Hooper*, 680 N.W.2d at 96, the existence of ample evidence independent of the false testimony supports the district court's conclusion that Caldwell failed to establish that without the allegedly false testimony of Brooks and Carnell, the jury might have reached a different conclusion. Caldwell was convicted of aiding and abetting, which requires that Caldwell knew his alleged accomplice was going to commit a crime and that Caldwell intended his presence or actions to further the commission of that crime. *State v. Bahtuoh*, 840 N.W.2d 804, 810 (Minn. 2013). The evidence of Caldwell's guilt of aiding and abetting was abundant even without the gun evidence at issue in Caldwell's petition. Specifically, Caldwell had a motive for the murder. He drove the shooter to the scene after the shooter identified the location of the intended victims. And Caldwell immediately sped from the scene of the crime, not pausing to render aid or even investigate whether any assistance was needed. Consistent with *Hooper*, I would affirm the district court's analysis of the second *Larrison* prong.

The majority reaches a different result by ignoring defense counsel's substantial attack on the testimony that Caldwell passed the gun to the shooter. The majority also errs when it summarily dismisses Caldwell's inculpatory statements to P.P. and C.P., where Caldwell admitted his participation in the crime, the undisputed testimony of Barber, Young and E.F. regarding Caldwell's on-going dispute with the One-Nines,

which established Caldwell's motive, and Caldwell's driving conduct, which positioned the shooter.[23] The majority's analysis is faulty and inconsistent with our precedent. Moreover, by affording no deference to the postconviction court's assessment of the impact of the allegedly false testimony, the majority effectively holds that a postconviction court's opportunity to observe the witnesses' testimony and the jurors' reactions to that testimony has no value when assessing the impact of false testimony on the jurors. In my mind, a postconviction court is uniquely qualified to assess the impact of the false testimony. Because the record in this case supports the postconviction court's assessment, I dissent.

## VI.

In sum, the majority dismisses the witnesses' responses to the crucial question of whether they testified truthfully at trial. It also misconstrues the relevant case law by suggesting that a simple contradiction in a witness's trial testimony and subsequent statement is sufficient, *by itself*, to satisfy the first prong of the *Larrison* test. Finally, the majority applies the wrong standard of review when it affords no deference to the postconviction court's determination that the facts alleged in the taped interviews, if believed, would not have changed the result obtained at trial. This lack of deference is especially troubling when the postconviction court had the unique opportunity to observe

---

[23]    In effect the majority holds that the verdict might have been different had the jurors known that Brooks was guessing when he said Caldwell passed the gun to the shooter and that Carnell was too drunk to remember the events surrounding the shooting. But as the record demonstrates, the jurors were made aware of both these facts and still found Caldwell guilty as charged.

the witnesses' trial testimony, and when the minor inconsistencies cited by the majority do not satisfy the second prong of the *Larrison* test, which requires a defendant to demonstrate that the jury might have reached a different verdict. For these reasons, I dissent from the majority opinion. Moreover, because the postconviction court's denial of Caldwell's request for an evidentiary hearing was not based on an erroneous view of the law, a clearly erroneous finding, or an arbitrary or capricious exercise of discretion, I would affirm.

GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Dietzen.